ARTHUR W. BENDFELDT, APPELLANT, v. DELBERT LEWIS
ET AL., APPELLEES.

30 N. W. 2d 293

Filed January 2, 1948.   No. 32285.

*Dryden & Jensen*, for appellant.

*Blackledge & Sidner*, for appellees.

Heard before SIMMONS, C. J., PAINE, MESSMORE, YEAGER, CHAPPELL, and WENKE, JJ., and LIGHTNER, District Judge.

LIGHTNER, District Judge.

Replevin for one red-necked roan steer calf yearling, weight approximately 1,000 pounds, carrying a brand on the left hip designated as IC over a bar. The jury found for the defendants and the plaintiff appeals.

There are three errors assigned as follows: (1) The trial court erred in overruling plaintiff's motion for a directed verdict at the close of defendants' evidence and at the close of all the evidence in said cause. (2) The court erred in giving instruction No. 9 on its own motion. (3) The verdict and judgment of the court are contrary to law. A consideration of these assignments requires a review of the evidence.

There is no doubt but that the steer in question was purchased by plaintiff on December 8, 1945. It was a branded animal and was never transferred by plaintiff pursuant to sections 54-106 and 54-118, R. S. 1943, of the brand law. Defendants claim, however, that the

facts testified to by them resulted in a trade of the calf in question for one of their own calves and that at the time the writ was issued they were the owners of the red-necked roan steer calf. The jury took their view of the facts.

The facts in defendants' favor which the evidence tends to establish and which they contend required submission of the case to the jury and justified its verdict are as follows: The plaintiff and defendants are near neighbors. All of these parties attended the stock show in Denver in early January 1946 and were away from home for several days or longer. The plaintiff, at that time an unmarried man living with his mother, hired Robert J. Randall, who lived about a mile away, to come to his place to look after his stock. Mr. Randall did not stay on plaintiff's place, but came there mornings to release the cattle from the pens, turned them into a cornstalk field for the day, and returned in the evenings to put them back in the pens. Sometime after the Lewises left home their cattle got loose and were often scattered along the same road over which Mr. Randall drove the plaintiff's cattle. Defendants had about 56 head of cattle, all white-faced, and plaintiff had 63 head of cattle, mixed, with some whitefaces among them. The defendant Delbert Lewis was the first of the three to return from Denver. He returned on Sunday evening, January 12, 1946, and found that their cattle had estrayed while he was away. He began hunting them up "right now," and found them all but one. In searching for this one he went to the plaintiff's place. Plaintiff was not yet home, so he talked to Mr. Randall. During the course of the conversation Delbert Lewis told Mr. Randall that they had a roan steer which did not belong to them. Mr. Randall said he thought such roan steer belonged to plaintiff because he (plaintiff) had two of them and now he has only one. He also said that he thought a white-faced steer in plaintiff's herd belonged to the Lewises because the Lewis cattle

were larger than plaintiff's and this steer was larger than plaintiff's: The steer was pointed out to Delbert and he identified it as theirs. However, no exchange of animals was made then because plaintiff was not at home and they were afraid that plaintiff's mother, who was there alone, would object. Delbert then left, but went back several times, and on some of these occasions he saw their steer at plaintiff's place. They did not find plaintiff at home to talk with until some time later. Four or five days later plaintiff came to the Lewis place and it was then they told him that this roan steer belonged to him. He went out to the lot where the cattle were, looked at the animal carefully, and finally said that it was not his. Defendants suggested they have a brand inspection to get the matter straightened out before any of the cattle were sold, but plaintiff insisted that they both had their right count and asked defendants: "What in the hell are you squawking about?" This conversation on the Lewis place was a little past the middle of January 1946. Nothing more was done about the matter until the plaintiff came over about the middle of May 1946 and demanded the steer.

It seems the immediate occasion for plaintiff's trip at that time was that he was about to sell the 26 head of cattle he still had left and he phoned for the brand inspector, a Mr. Clark, to come out and give him the proper clearance papers. When Mr. Clark got there he discovered that plaintiff had in his lot one less steer carrying a brand on the left hip designated as IC over a bar than he said he had. Plaintiff at that time, although he expressly stated he had not counted his cattle from the time he returned from Denver, computed, from the 26 he had left and from the number he had sold or butchered, that he was one short. When he got to Lewis' place he asked about his steer and Lewis replied: "You cough mine up and you can have this one." Further conversation took place between them in which

they called his attention to the fact that in the spring he had said he had his right count. However, he insisted that he had the brand release on this steer and that it was his. It further developed from the testimony of Delbert Lewis that the Lewis steer weighed about 300 pounds more than their own steer and was worth probably $50 more, but that they were willing to lose the $50 in order to get along with their neighbor.

Defendants' theory of the transaction is summed up in the final answer of Delbert Lewis at the close of his testimony as follows: "When he came over there and said he had his right count and knew his right cattle, and we told him no, that he had one of ours and this one we had was his, and he said, 'You've got your right count and I've got my right count, so what in the hell are you squawking about', - I figured that we had made a trade." The evidence of Dwayne Lewis was substantially the same as that of his father, Delbert Lewis.

We are of the opinion that the testimony of defendants is sufficient to justify the jury, if they believed it, in finding that a trade had been made of the animals and that the defendants at the time of the trial were the owners and entitled to possession of the steer in question. A contract may be made in various ways, including the conversation of the parties, or their conduct, or both. When the plaintiff said to the defendants that they had their right count and he had his, so what were they squawking about, and left without taking his own steer which was offered to him, and for over three months did nothing further, while in the meantime each party fed and cared for the steer in his possession, he indicated an intention to keep the animal of the Lewises which he had and let them have the red-necked roan, which indubitably was his and which he could have had when he went to the Lewis place shortly after the middle of January 1946.

It is scarcely necessary, we think, to state again the often repeated rule that the verdict of a jury based on

conflicting evidence will not be disturbed on appeal, nor cite authorities on that proposition. A brand on livestock is only prima facie evidence of ownership which may be rebutted. § 54-109, R. S. 1943; 1 R. C. L., Animals, § 24, p. 1083; 3 C. J. S., Animals, § 26, p. 1131. "The manifestation of mutual assent may be made wholly or partly by written or spoken words or by other acts or conduct." Restatement, Contracts, § 21, p. 27. An exchange of branded steers, without the formality of a bill of sale, is not unenforceable or void per se, especially under the circumstances in this case.

We do not believe that the statute was intended to prohibit transactions of this kind, and if it was so intended the fault was that of the plaintiff, rather than defendants. There was little that defendants could do about the matter, except perhaps to return the roan steer to plaintiff, demand their own white-faced steer in return, and bring a replevin action if plaintiff refused to let them have it. The statute was enacted for the protection of the owners of the brands and was not intended to prohibit private sales or trades between individuals. Mr. E. E. Clark, who is the chief investigator and assistant chief brand inspector for the Nebraska Brand Committee, testified that the department never even inspects private sales between farmers unless they request it.

There was, therefore, in our opinion sufficient evidence to go to the jury on the question of ownership and the verdict of the jury should stand, unless there was prejudicial error during the trial. Appellant assigns as error the giving of instruction No. 9. Said instruction is as follows: "The jury having deliberated for 14/00 hours without having arrived at a verdict, the Court gives you the following Instruction.

"You are instructed that it is the law of this state that the brand upon a steer is prima facie evidence of title, but this presumption may be rebutted by proof that the possession is fair and legal.

"And in this case, you are instructed that if you find from a preponderance of the evidence that the defendant became the owner of the steer in question by reason of a trade with the plaintiff for a steer belonging to defendant, and that such trade was fully consummated by a meeting of the minds and agreement of the plaintiff and defendant, then your verdict should be for the defendant and against the plaintiff.

"If you do not so find, your verdict should be for the plaintiff."

One objection to this instruction is evidently based upon appellant's claim that the evidence is insufficient to go to the jury on the question of ownership. This has already been discussed. Appellant further objects to that part of the instruction which tells the jury that the brand upon a steer is prima facie evidence of title, but that such presumption may be rebutted by proof that the possession is fair and legal. What has been said answers this contention.

It is not the function of this court to pass upon the evidence, but only to determine whether or not there was sufficient evidence to sustain the verdict. We find that the evidence was sufficient and that no error was committed. The verdict and judgment of the district court are affirmed.

AFFIRMED.