IN RE ESTATE OF JOSEPH L. McGOWAN, DECEASED.
THOMAS F. McGOWAN, APPELLEE, V. JOHN M. McGOWAN
ET AL., APPELLANTS.
250 N. W. 2d 234

Filed February 9, 1977. No. 40704.

Martin A. Cannon of Matthews, Kelley, Cannon & Carpenter, for appellants.

John R. Douglas of Cassem, Tierney, Adams & Gotch, for appellee.

Heard before WHITE, C. J., McCOWN, and CLINTON, JJ., and STUART and RIST, District Judges.

McCown, J.

This is an action to contest the admission of a will to probate on the grounds of lack of testamentary capacity and undue influence. The county court of Douglas County admitted the will to probate and the contestants appealed to the District Court. The case was tried to a jury in the District Court and the jury found in favor of the proponent and against the contestants on both grounds. The District Court entered judgment admitting the will to probate and the contestants have appealed.

Joseph L. McGowan died at Omaha, Nebraska, on April 14, 1973, leaving a last will and testament. He was 80 years old and a bachelor. His nearest relatives and only heirs-at-law were two nieces and three nephews, the children of his deceased brother. The proponent, who was the principal beneficiary and executor under the will, was Thomas F. McGowan, a second cousin and a godson of the testator.

The estate consisted exclusively of personal property, principally stocks, bonds, and cash, with a value of approximately $770,000. Approximately $40,000 of that amount was in the stock of Uncle Sam Breakfast Food Company, a closely held family corporation.

The will, after several minor bequests, left all the Uncle Sam Breakfast Food Company stock in equal shares to the five nieces and nephews or the survivors of them. The remainder of the estate was left to the First National Bank of Omaha in trust for the benefit of Thomas F. McGowan during his lifetime. Upon his death, or when the younger of his two named sons became 25 years of age, whichever was later, the trust was to terminate and be distributed to the two sons or their children by right of representation.

The witnesses at the trial generally agreed that the testator's relationships with his nieces and nephews had been cordial and friendly over the years. One of the nephews was the managing officer of the family break-

fast food company and another nephew was also employed there. The nephews and nieces who lived in Omaha visited the testator in varying degrees of regularity and he visited them in similar fashion for many years. One niece, who did not live in Omaha, came there several times a year and visited the testator on almost all those occasions. One niece, Mary Jane Edney, was a favorite of the testator. · She and her husband lived close to the testator until just before he moved into a retirement home in 1970. She had the testator in her home for dinner on special holidays and on many Sundays. She had taken special care of the testator's mother in her later years when the testator and his mother were living together. After the death of the testator's mother, the testator often depended upon Mary Jane and she did many things for him.

There was evidence that the testator had had a serious falling out with his brother James which had severed their relationship prior to James' death. The indicated cause of the bitterness between the brothers stemmed from the removal of the testator as president of the breakfast food company many years previously. A friend of the testator who received a $1,000 bequest under the will testified that after the testator's brother died, the testator told him that the nieces and nephews were not going to get any of his money, and that Mary Jane was just one of the clique.

Thomas F. McGowan, the proponent of the will, was a godson of the testator. His father and the testator were first cousins. The testator had always treated Thomas as if he were a much closer relative. From the time Thomas was a child, the testator had been generous with his gifts to Thomas. Beginning in his early teens, Thomas would go to testator's house weekly to wash the car and cut the grass. As he grew older, this developed into a standing appointment to do such errands and chores as the testator might need. The weekly schedule had continued for some 17 years

or more prior to the testator's death. In 1965, the testator gave the keys to his home to Thomas so that Thomas would have access to the house in the event of an emergency. In 1966, the testator placed Thomas' name on his safe deposit box. In 1970, the testator opened a joint checking account with Thomas. At that time the testator was in the hospital for a hernia operation and wanted to have someone able to pay his bills for him. The checking account generally had about $8,000 in it. A much larger checking account was maintained by the testator on which only the testator could sign checks. When the testator became ill and entered the hospital in December of 1972, Thomas wrote checks on the joint bank account for all the testator's bills and continued to do so after the testator was released from the hospital. At the testator's direction, Thomas then began to help the testator update his dividend records on stocks and thereafter Thomas maintained the testator's dividend records, which had previously been kept by the testator.

There is no evidence that the testator had made any will prior to 1973. In September of 1972, the testator asked Thomas to select an attorney to prepare a will for the testator. Thomas inquired about attorneys at two Omaha bank trust departments and selected the attorney who had drafted his own will some 10 years before. He made an appointment for the attorney to see the testator about making a will but later canceled the appointment because the testator was not feeling well. Thomas testified that on December 4, 1972, the testator again brought up the question of a will and asked Thomas if he wanted the stock of the family corporation. When Thomas said "no," the testator stated that he would give it to the nephews and nieces, although he had not previously intended to give them anything. That evening the testator had congestive heart failure and was placed in the hospital in the intensive care unit. The next morning in the hospital,

at the testator's request, Thomas wrote down the bequests recited to him by the testator and then took them to the attorney who had been contacted previously. The attorney drew a will based on Thomas' notes and took it to the hospital on December 6, 1972. The testator was quite ill on that day and did not see the attorney. The attorney returned the next day. The attorney talked to the testator with a nurse present. The attorney informed the testator that Thomas had given him a list but did not tell the testator what that list contained. He then asked the testator what the testator wanted and was told essentially the same things that were on Thomas' list. At this meeting the testator also asked about a trust arrangement for Thomas and his sons and about the powers of an executor. He did not execute the will the attorney had brought along. The nurse who was present noted on the chart that the testator was alert and oriented.

Nothing more was done about the will until January 8, 1973, when Thomas again called the attorney and asked him to go see his uncle. On January 9, 1973, the attorney took two different drafts of wills to the hospital for the testator to consider. He was accompanied by an associate and a secretary to witness the will. He went in alone and talked to the testator about the wills, and explained and discussed the trust provisions in particular. He then called the witnesses in and they conversed with the testator a few minutes before he signed the will. In the presence of these two witnesses the attorney asked if the trust provisions for Thomas and his children were clear to the testator, and the testator said that he understood and that was what he wanted to do. The will was then signed and witnessed.

The testator returned to his retirement residence on January 10, 1973. In March the testator suffered a stroke and was returned to the hospital, and on April 14, 1973, he died.

The testimony of the witnesses was in some conflict as to the testator's mental competence and susceptibility to influence during the period that he was in the hospital prior to the execution of his will. He was visited frequently by the various nephews and nieces and Thomas. The medical testimony was generally that he was intermittently confused but at other times was mentally clear and alert. He recognized his relatives, his nurses, and his doctor by name, and could and did carry on conversations with them and other friends in the hospital. A private duty nurse testified that the testator was susceptible to influence but she also testified that he refused to take medication by shot, and there were times when he refused to let her take him for walks in the hall. There was testimony that the testator was perfectly alert. There was testimony that the testator was pliable and testimony that he was unpredictable. The testator was hard of hearing, had had one cataract operation and needed another, and there was some testimony that he was physically weak. He was able to and did read the newspaper and watched TV.

The jury found in favor of the proponent and against the contestants upon the issues of mental competency and undue influence. The District Court entered judgment affirming the order of the county court admitting the will to probate.

The contentions of the contestants on this appeal rest on the assertion that the instructions to the jury erroneously placed the burden on the contestants to prove undue influence. The argument is grounded on the assumption that the evidence was sufficient to establish a presumption of undue influence, and that under the provisions of section 27-301, R. R. S. 1943, the establishment of the presumption shifted the burden of proof from the contestants to the proponent and the instructions were therefore erroneous. The critical issues involve the effect of section 27-301, R. R. S. 1943, and

whether it applies to a "presumption" of undue influence in the making and execution of a will.

Section 27-301, R. R. S. 1943, is a part of the Nebraska Evidence Rules adopted by the Legislature in 1975, and is effective as to all trials commenced after December 31, 1975. That section provides: "In all cases not otherwise provided for by statute or by these rules a presumption imposes on the party against whom it is directed the burden of proving that the nonexistence of the presumed fact is more probable than its existence."

Prior to the effective date of section 27-301, R. R. S. 1943, the effect of a presumption in Nebraska was only to shift the burden of going forward with the evidence, and the burden of proof or persuasion did not shift. When evidence was introduced to rebut the presumption, the presumption disappeared. The presumption was not evidence itself but only sustained the burden of proof until evidence rebutting the presumption was introduced. In re Estate of Goist, 146 Neb. 1, 18 N. W. 2d 513; Loomis v. Estate of Davenport, 192 Neb. 461, 222 N. W. 2d 369.

The Nebraska Evidence Rules, including section 27-301, R. R. S. 1943, were essentially the same as the then *proposed* Federal Rules of Evidence, but were adopted by the Nebraska Legislature prior to the final adoption of the federal rules by Congress. When Congress finally adopted the federal rules later in the same year, Rule 301 was completely changed. Instead of the language of section 27-301, R. R. S. 1943, Rule 301 of Public Law 93-595 reads: "In all civil actions and proceedings not otherwise provided for by Act of Congress or by these rules, a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast." In essence, the new federal rule is the

former Nebraska rule. Although the Nebraska Legislature adopted the proposed version of federal Rule 301, it did not adopt the special section on the procedural effect of that rule. Neither the Nebraska rules nor the federal rules define or prescribe what constitutes a presumption within the meaning of Rule 301.

A presumption is a standardized practice under which certain facts are held to call for uniform treatment with respect to their effect as proof of other facts. McCormick on Evidence (2d Ed.), § 342, p. 802. The same authority suggests that "presumption" is the slipperiest member of the family of legal terms, except its first cousin, "burden of proof." Reasons for the creation of presumptions are numerous and the treatment of presumptions also differs widely. There are at least eight senses in which the term has been used by courts. The former Nebraska approach to presumptions is ordinarily referred to as the "bursting bubble" theory. Under that approach when evidence was introduced to rebut the presumption, the presumption disappeared and the burden of proof or persuasion did not shift. Under such a rule whether a particular set of basic facts gave rise to the dignity of a presumption was ordinarily not critical in the matter of instructing a jury after trial. What was many times referred to as a "presumption" was often merely a permissible or probable inference, or was a method of indicating that the evidence was sufficient to withstand a motion for a directed verdict or to constitute a prima facie case. In terms of instructions to the jury the new rule poses far greater problems. An additional problem is posed in a case such as this because the presumed fact of undue influence is also the ultimate fact to be determined by the jury.

Ordinarily the basic facts which give rise to a true presumption are specific and definite. They can be readily determined and uniformly applied. That is not the case with the so-called presumption of undue in-

fluence in Nebraska. An analysis of the Nebraska cases demonstrates that the basic facts which have been held to give rise to a presumption of undue influence in the making of a will have not been specific nor definite nor uniform. Instead the basic facts have themselves varied, and have been formulated from the facts and circumstances of each particular case. Almost without exception we have used the term "presumption" in connection with undue influence to mean that the evidence was sufficient to constitute a prima facie case or to withstand a motion for a directed verdict. In most instances the term "presumption" seems to have been intended to mean a permissible or probable inference when used in undue influence cases.

The Report of the Committee on Practice and Procedure in connection with the proposed Nebraska Rules of Evidence confirms the conclusion that this court can place the burden of proof in the first place, or hold that a particular set of basic facts does not rise to the dignity of a presumption under the rule. It is also obvious that situations which have previously been referred to as presumptions when only permissible or probable inference was meant, or those where the term "presumption" was used to indicate that the basic facts were sufficient to constitute a prima facie case or to withstand a motion for directed verdict, are cases which may be excluded from the operation of the rule. See Proposed Nebraska Rules of Evidence, Article III, Presumptions, p. 35 (1973).

We therefore hold that under Nebraska law a so-called "presumption of undue influence" is not a presumption within the ambit and meaning of section 27-301, R. R. S. 1943.

The policy considerations which support the right of a competent testator to dispose of his property at death by a duly executed will also demand that the burden of proof on the issue of undue influence be placed upon the party contesting the will. We therefore hold that

in a will contest the burden of proof or the risk of non-persuasion on the issue of undue influence is on the contestant and remains there throughout the trial.

In the case at bar it is clear that the factual issues of undue influence were for the jury, and that the instructions placed the burden of proof on the contestants, and the jury brought in its verdict for the proponent. If the instructions properly placed the burden of proof, the verdict and judgment must be affirmed. In view of the determinations made, the burden of proof was properly placed and the judgment is affirmed.

AFFIRMED.