Duane CUGNINI and Pat Cugnini, d/b/a
Hi-Country Cattle Co., a
partnership, Petitioner,

v.

REYNOLDS CATTLE CO., a Colorado
corporation; and Wally Grant, Buck
Grant and Charles Grant, d/b/a Platte
Valley Feeders, Respondents.

No. 82SC92.

Supreme Court of Colorado,
En Banc.

Sept. 4, 1984.

I.H. Kaiser, P.C., I.H. Kaiser, Denver,
for petitioner.

Hutchinson, Black, Hill, Buchanan &
Cook, William D. Meyer, James L. Carpenter, Jr., Boulder, for Reynolds Cattle Co.

Holme, Roberts & Owen, Stephen E. Snyder, Denver, for Platte Valley Feeders.

ROVIRA, Justice.

We granted certiorari to review the court
of appeals' decision in *Cugnini v. Reynolds Cattle Co.*, 648 P.2d 159 (Colo.App.
1981), reversing the trial court's ruling that
the plaintiffs, Duane and Pat Cugnini,
d/b/a Hi-Country Cattle Company (the
Cugninis), are entitled to recover on their
action for conversion against defendant
Reynolds Cattle Company (Reynolds). The

court of appeals held that the livestock bill of sale laws must be complied with to pass title to cattle, but since neither the Cugninis nor Reynolds complied with those laws, Colorado's version of the Uniform Commercial Code (UCC) should apply, and, under it, title to the cattle passed from the Cugninis to Reynolds, so the Cugninis' action for conversion must fail. We affirm the result reached by the court of appeals.

## I.

The Cugninis were in the business of buying, selling, and feeding cattle. In October 1978, the Cugninis paid J.R. Kroeger, who owns LU Cattle Company, $116,643.80 for 335 cattle. Kroeger bought the cattle from Jerry Wilger, who raises cattle at the Mill Creek Ranch. When the Cugninis were concluding the purchase, they consulted Dave Williams, a Colorado State Brand Inspector, who filled out a brand inspection certificate that shows the specific brands involved and how many of the purchased cattle carry which brands. The certificate lists "Mill Creek Ranch" under "owned by" and "Duane Cugnini" under "sold to." No explanation appears in the record as to why Wilger and not Kroeger is listed as the seller to Cugnini.

A portion of the brand inspection certificate is entitled "bill of sale." That portion is signed by Wilger as the seller. But blanks on the bill of sale for the seller's address, the buyer's signature and address, and a witness' signature and address were not filled out. Nonetheless, this transaction, the brands involved, and various associated data are listed in a "Report of Colorado Cattle Inspector" entered in the records of Colorado's Department of Agriculture.

The Cugninis then agreed to sell the cattle to Jerry Russell, who was in the business of buying and selling cattle. The Cugninis had experienced some difficulties with Russell[1] prior to this transaction. Duane Cugnini testified that, due to these difficulties, he told Russell that he would not "release" the cattle until Russell provided the money due. Russell testified[2] that no such condition was mentioned. In any event, Russell told Duane Cugnini to ship the cattle to Platte Valley Feeders (PVF). Although Cugnini had never done business with or heard of PVF before, he followed Russell's direction and arranged for the cattle to be shipped to PVF by truck. In the four bills of lading accompanying the shipment, Duane Cugnini is listed as the "shipper." In the spaces following "consigned to," the four bills contain the following phrases: "Duane Cugnini c/o Platte Valley Feeders," "same, Platteville [sic] Valley Feeders," "Platteville [sic] Valley Feeders," and "Platte Valley Feeders." Russell, who had had business dealings with PVF for approximately a year and a half, called John Shaffer, PVF's manager, and said that he was sending 335 of his (Russell's) heifers to PVF. Russell asked Shaffer to hold the cattle overnight and to dip them the next day. Shaffer agreed. The parties stipulated that Russell never paid the Cugninis for the cattle.

When the shipment arrived at PVF, three of the cattle had died. The remaining 332 cattle were put in PVF's lot. Russell tried to sell the cattle to PVF, but after considering the proposition for a few hours, PVF decided not to buy them. Russell then sold the cattle to Reynolds, whose feedlot is adjacent to PVF's lot. Reynolds, who had never experienced problems in previous dealings with Russell over approximately two years, presumed that Russell owned the cattle and paid him $115,599.80 for them. Russell gave Reynolds a purported bill of sale which lists the price, the date, Jerry Russell as the seller, "332" in a col-

1. The trial court found: "On two occasions checks given by defendant Russell in payment for cattle sold by [the Cugninis] had been returned for insufficient funds, and at the time of the instant transaction the problem of a short check for $106,000.00 had not been cleared up." The record supports this finding.

2. The trial court admitted a transcript of Russell's testimony in his bankruptcy proceeding. At the time of trial, Russell was serving a term of imprisonment in a federal penitentiary in Arizona.

umn labelled "QUAN.," "Mixed Heifers" in a column labeled "DESCRIPTION," and "Reynolds Cattle Co." in a space after "Name." No signature or address of a witness appears on the bill. It does not contain the buyer's signature or address. The cattle are not specifically identified by brand or otherwise. No indicia of prior ownership appears on the bill, but Russell promised that he would provide Reynolds with a brand inspection certificate for the cattle at a later date. The cattle were moved from PVF's lot to Reynolds'.

Approximately ten days after Duane Cugnini shipped the cattle to PVF, he received a call from his father indicating that Russell was "in trouble" and the cattle "weren't going to be paid for." Duane Cugnini then went to see Reynolds and argued about the cattle. After Reynolds refused to return them, what the trial court described as "an episode reminiscent of the tales of the Old West" occurred. Armed with revolvers and riding on horses, the Cugninis and a group of men entered Reynolds' property and drove the cattle in question to a nearby ranch. Later, Reynolds regained the cattle with the aid of a sheriff.

The Cugninis sued Reynolds and PVF to recover the cattle and damages. Reynolds counterclaimed for damages arising from the trespass. Pursuant to a pretrial order, the cattle were sold and the proceeds were deposited with the district court. The trial court held that compliance with the livestock bill of sale laws, sections 35–54–101 to –106, 14 C.R.S. (1973), must occur before title to cattle passes, that the Russell/Reynolds transaction did not satisfy the statute, and, therefore, Reynolds converted the cattle when it failed to comply with the Cugninis' demand for them. In addition, the trial court entered judgment in favor of PVF on the Cugninis' claims against it, and in favor of Reynolds on its trespass claim.

The court of appeals affirmed the judgment in favor of PVF and the judgment on the trespass claim, but reversed the conversion judgment against Reynolds. The court reasoned that the livestock bill of sale laws control passage of title to cattle, but that since neither the sale to Reynolds nor the sale to the Cugninis complied with those statutes, the UCC should be applied to determine who is entitled to the money deposited with the district court. It held that, pursuant to section 4–2–403, 2 C.R.S. (1973), the Cugninis entrusted possession of the cattle to Russell, who was then able to convey good title to Reynolds, who, accordingly, is entitled to the proceeds of the sale of the cattle. We granted certiorari to review the three issues discussed below as to the Cugninis and Reynolds. We did not grant certiorari to review the judgment as to the Cugninis' claim against PVF.

## II.

### The Livestock Bill of Sale Law

One of the elements that the Cugninis must prove to prevail in their action for conversion is that they, rather than Reynolds, held title to the cattle immediately prior to the sale ordered by the district court. *See Byron v. York Investment Co.*, 133 Colo. 418, 296 P.2d 742 (1956); *Herbertson v. Cohen*, 132 Colo. 231, 287 P.2d 47 (1956). Accordingly, we must determine whether title passed from the Cugninis as a result of their dealings with Russell and his subsequent transaction with Reynolds. But before we reach that issue, we must determine what law applies to the transfer of title of cattle.

Colorado's livestock bills of sale statutes, sections 35–54–101 to –106, 14 C.R.S. (1973), set guidelines for such bills of sale and penalties for noncompliance. Section 35–54–101 states in part that "[n]o person ... shall sell ... nor shall any person ... buy ... livestock, unless the person so selling ... gives, and the person buying ... takes, a bill of sale, in writing, of the livestock ...." Section 35–54–103(2) provides:

"Both the seller and the buyer shall sign a bill of sale, giving the post-office address of each, in the presence of a witness, who also signs with his name and address, and who is a legal resident of

the county where the transfer of the described livestock takes place. The bill of sale shall be dated the day of the transaction."

The court of appeals correctly stated that neither the sale to the Cugninis nor the sale to Reynolds satisfied the requirements of section 35–54–103(2). Even if more than one document can be used to constitute a bill of sale,[3] Reynolds' bill still lacked a witness' signature and address, and the buyer's address. The Cugninis' bill lacked at least the buyer's signature and address, and the seller's address.[4]

■ However, noncompliance with the livestock bill of sale requirements does not necessarily prevent transfer of title. Section 35–54–105(1), 14 C.R.S. (1973), states:

"Any person who sells or offers for sale or trades any livestock upon which such person has not his recorded mark or brand, or for which the person so offering has neither bill of sale nor power of attorney from the owner of such livestock authorizing such sale, is guilty of theft, unless such person upon trial shall establish and prove that he was at the time the actual owner of the livestock so sold or traded, or offered for sale or trade, or that he acted by the direction of one proven to be the actual owner of such livestock."

Thus, the livestock bill of sale statutes contemplate that being an "actual owner," i.e., holding valid title, is not necessarily dependent upon possessing a bill of sale that complies with statutory requirements.

Since the livestock bill of sale statutes do not necessarily determine when valid title to cattle passes, we must look to other sources of law to resolve the present dispute. As discussed below, Colorado's version of the UCC also addresses the issue of when title to cattle passes.

■ Statutes that address the same subject matter should be construed harmoniously if such a construction is possible. *McKinley v. Dunn*, 141 Colo. 487, 349 P.2d 139 (1960); *see People in the Interest of M.K.A.*, 182 Colo. 172, 511 P.2d 477 (1973). Although the livestock bill of sale laws control other questions that may arise out of the sale of cattle, the principle of harmonious construction of statutes leads us to the conclusion that, under the circumstances of this case, the passage of title is controlled by the pertinent provisions of the UCC rather than by the livestock bill of sale statutes. Our holding on this issue is consonant with the current position taken by the majority of jurisdictions that have construed similar statutes. *See Atwood Chevrolet-Olds, Inc. v. Aberdeen Municipal School District*, 431 So.2d 926 (Miss. 1983); *Island v. Warkenthien*, 287 N.W.2d 487 (S.D.1980); *American Lease Plans, Inc. v. R.C. Jacobs Plumbing, Heating & Air Conditioning, Inc.*, 274 S.C. 28, 260 S.E.2d 712 (1979); *Wolf v. Schaben*, 272 F.2d 737 (8th Cir.1959) (applying Nebraska law); *Bendfeldt v. Lewis*, 149 Neb. 107, 30 N.W.2d 293 (1948); *see also Brumley Estate v. Iowa Beef Processors, Inc.*, 715 F.2d 996 (5th Cir.1983) (applying Texas law); *but see Wilson v. Burrows*, 27 Utah 2d 436, 497 P.2d 240 (1972).

### III.

### Entrustment

■ Section 4–2–403, 2 C.R.S. (1973) provides:

"(2) Any entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer

---

3. The Cugninis argue that the brand inspection certificate attached to their purported bill of sale should be considered in determining whether the statutory requirements have been met. Similarly, the Reynolds argue that their sight draft used to pay Russell for the cattle in question should be considered for this purpose. We express no view as to whether this type of tacking is effective.

4. Brand Inspector Dave Williams signed the brand inspection that is attached to the Cugninis' purported bill of sale, and the uncontroverted evidence is that he witnessed the transaction. However, no one signed the blank provided for a witness' signature on the Cugninis' bill of sale, and the space provided for a witness' address was also left blank.

all rights of the entruster to a buyer in ordinary course of business.

(3) 'Entrusting' includes any delivery and any acquiescence in retention of possession regardless of any condition expressed between the parties to the delivery or acquiescence and regardless of whether the procurement of the entrusting or the possessor's disposition of the goods have been such as to be larcenous under the criminal law."

No one disputes that cattle are goods,[5] that Russell was a merchant[6] who deals in goods of that kind, or that the Cugninis had title to the cattle prior to the Cugnini/Russell transaction.[7] Therefore, if the actions of the Cugninis regarding their dealings with Russell amount to entrusting of possession of the cattle, and if Reynolds was a buyer in ordinary course of business, then Russell had power to transfer all rights of the Cugninis to Reynolds, including valid title to the cattle.

First, we consider whether the Cugninis' actions amount to an entrusting of possession of the cattle to Russell within the meaning of section 4–2–403. "Entrusting of possession" within the meaning of section 4–2–403 is a broad concept. Professor Grant Gilmore, who was one of the drafters of the UCC, stated that the Code "defines 'entrusting' as including everything short of armed robbery (larceny is expressly approved)." G. Gilmore, *The Good Faith Purchase Idea and The Uniform Commercial Code: Confessions of a Repentant Draftsman*, 15 Ga.L.Rev. 605, 618 (1981). *See also* 3A R. Duesenberg & L. King, *Bender's Uniform Commercial Code Service: Sales & Bulk Transfers*

§ 10.06[3] (1984) (" 'Entrustment' should be given the widest possible interpretation."). The Cugninis placed substantial trust in Russell regarding the cattle in question. After the Cugninis agreed to sell them to Russell, they followed his directions to ship them to PVF and never told PVF not to release the cattle to Russell even though the Cugninis had never heard of nor dealt with PVF before. The Cugninis acquiesced in the cattle's presence at the point designated by Russell for approximately ten days. They trusted Russell to arrange for and to oversee the care and feeding of the cattle during this time period.

However, it still remains to be determined whether this trust constitutes an entrustment of possession to Russell within the meaning of the applicable statute. The cattle were never placed on Russell's property or usual place of business. The bills of lading bear no indication that Russell was entitled to possession of the cattle.

According to White and Summers, "[i]n determining whether there is possession for the purpose of entrustment the court should look to the dealer's appearances of control over the goods."[8] J. White & R. Summers, *Handbook of the Law Under the Uniform Commercial Code* 143 (1980). Russell had possession of the cattle under this test. The Cugninis gave Russell, a cattle dealer, apparent control over the care and feeding of the cattle at PVF. Reynolds, who had been dealing with Russell for approximately two years without previous difficulties, observed the apparent control that Russell had over the cattle and concluded that they belonged to him. The

---

**5.** *See* § 4–2–102, 2 C.R.S. (1973); section 4–2–105(1), 2 C.R.S. (1973).

**6.** *See* § 4–2–104(1), 2 C.R.S. (1973).

**7.** No one disputes that Kroeger, who is not a party to this action, sold the cattle to the Cugninis, who paid Kroeger the full purchase price, and that the Cugninis took delivery of the cattle from Kroeger. *See* § 4–2–401, 2 C.R.S. (1973 & Supp.1983). Reynolds does argue that the Cugninis never possessed valid title because they failed to comply with the bill of sale laws, but our holding in part II establishes that noncom-

pliance with such laws does not prevent the passage of title under the circumstances of this case.

**8.** Another commentator uses a similar test to determine what constitutes entrustment of possession for the purposes of UCC § 2–403: "The goods must be in such a physical position as to be *regarded* within the possession of the entrustee." 3 R. Anderson, *Anderson on the Uniform Commercial Code* § 2–403:38 (3d ed. 1983) (emphasis added). As with White and Summers' test, the focus of Anderson's test is upon appearance.

Cugninis' silence for approximately ten days bolstered the appearance that Russell had control over the cattle.

The Georgia Court of Appeals used a similar rationale in *Simson v. Moon,* 137 Ga.App. 82, 222 S.E.2d 873 (1975). John Moon bought a wrecker truck from Hollowell, a wrecker truck dealer. Moon understood that, prior to delivery, the truck would have wrecker equipment mounted in Chattanooga, Tennessee. Thereafter, Hollowell sold the same truck to O.C. Simson, who was told that the truck was in Chattanooga to have its wrecker equipment installed.[9] Hollowell absconded with the proceeds of the two sales, and was not a party to the action. The court concluded that Moon entrusted possession of the truck to Hollowell within the meaning of Georgia's version of the UCC because the wrecker truck dealer "manifested his ability to control and dispose of the truck as if it were in his inventory." *Id.,* 222 S.E.2d at 875. Thus, in the context of a voluntary transfer, the court focused on the appearance of control shown by the dealer.

We hold that the Cugninis entrusted possession of the cattle to Russell within the meaning of section 4–2–403(2), 2 C.R.S. (1973). Our holding on this issue is in accord with the overall policy of the UCC's entrustment provision: to restrict impediments to the free flow of commerce when buyers in the ordinary course of business are involved. *See Security Pacific National Bank v. Goodman,* 24 Cal.App.3d 131, 100 Cal.Rptr. 763 (1972); *Independent News Co., Inc. v. Williams,* 293 F.2d 510 (3d Cir.1961); 1 R. Alderman, *A Transactional Guide to the Uniform Commercial Code* 266 (1983); F. Leary, Jr. & W. Sperling, *The Outer Limits of Entrusting,* 35 Ark.L.Rev. 50, 53 (1981); Note, *U.C.C. Section 2–403: A Reform in Need of Reform,* 20 Wm. & Mary L.Rev. 513, 556 (1979).

### IV.

Buyer in Ordinary Course of Business

■ The final issue is whether Reynolds, during the Russell/Reynolds transaction,

was a "buyer in ordinary course of business" for the purposes of section 4–2–403(2), 2 C.R.S. (1973). Section 4–1–201(9), 2 C.R.S. (1973) states:

> " 'Buyer in ordinary course of business' means a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind . . . ."

According to section 4–2–103(1)(b), 2 C.R.S. (1973), " '[g]ood faith' in the case of a merchant means honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." There is no dispute that Reynolds is a merchant, that it bought the cattle from Russell, who was in the business of selling cattle, that it exercised honesty in fact, and that it had no knowledge that the sale was in violation of any third party's rights. The controversy here is whether the cattle were bought in ordinary course and whether Reynolds observed reasonable commercial standards of fair dealing in the trade. Specifically, the Cugninis argue that Reynolds violated both of these standards by failing to acquire a brand inspection certificate prior to paying for the cattle, and by accepting an inadequate bill of sale.

The trial court made no findings of fact explicitly directed at the broader issue of whether Reynolds achieved "buyer in ordinary course of business" status. But the trial court did make findings of fact which pertain to the specific grounds relied upon by the Cugninis:

> "The Court finds that the best practice is to require the production of a brand inspection certificate in connection with a sale of cattle; however, the receipt of the brand inspection certificate is sometimes delayed until after receipt of the cattle. Some purchasers refuse to pay for cattle until after the brand certificate is received; however, others, on occasion, will pay for cattle before the delivery of a brand inspection certificate and rely on getting it later.

**9.** The two sales apparently occurred in some place other than Chattanooga.

"There was also testimony concerning the type of bills of sale common in the industry. This evidence was not as exhaustive as that concerning brand inspections; however, from it the Court concludes that the bill of sale used in this transaction was somewhat unusual in its brevity and lack of detail."

The trial court's findings are supported by testimony in the record from various cattle merchants.

The trial court's findings show that Reynolds' failure to obtain a brand inspection certificate prior to paying for the cattle was within the ordinary course. Russell promised Reynolds that he would send a brand inspection certificate at a later date. The trial court also found that this was not an unusual arrangement. The trial court found that the bill of sale given to Reynolds was only "somewhat unusual in its brevity and lack of detail." In light of the trouble-free cattle dealing relationship between Russell and Reynolds prior to the transaction in question, we conclude that the bill of sale was also within the ordinary course.

The trial court's findings reveal that the standards of fair dealing in the cattle trade prevailing at the time of trial were rather loose. They also establish that failure to obtain a brand certificate before paying for the cattle was within these standards. Similarly, the trial court's findings that the bill of sale was only "somewhat unusual in its brevity and lack of detail" is not enough to take the bill outside of the prevailing commercial standards of fair dealing in the trade.

In the absence of evidence of uniform methods of fair dealing among cattle dealers, whether these standards are reasonable is a more difficult issue. However, at least within the context of the Russell/Reynolds relationship, we conclude that the standards are reasonable. Reynolds reasonably presumed that Russell, a known cattle dealer, owned the cattle by virtue of his control and possession of them. *See American Lease Plans, Inc. v. R.C. Jacobs Plumbing, Heating & Air Conditioning, Inc.*, 274 S.C. 28, 260 S.E.2d 712 (1979). The prior relationship between Russell and Reynolds also supports the view that, at least as to Reynolds, the rather loose commercial standards of fair dealing prevailing in the cattle trade were reasonable. *See also Humphrey Cadillac and Oldsmobile Co. v. Sinard*, 85 Ill. App.2d 64, 229 N.E.2d 365 (1967). Although Reynolds made only minimal efforts regarding the brand inspection certificate and the bill of sale, we conclude that the transaction was still within the ordinary course and pursuant to reasonable commercial standards of fair dealing in the cattle trade.

The Cugninis entrusted possession of the cattle to Russell, who then had power to transfer the Cugninis' title to a buyer in the ordinary course of business. Since Reynolds achieved that status, Russell transferred to Reynolds the Cugninis' title to the cattle. Since Reynolds had title to the cattle immediately prior to the sale ordered by the district court, Reynolds is entitled to the proceeds of the sale, and the Cugninis' action for conversion must fail.

The judgment of the court of appeals is affirmed.