BROKEN BOW PRODUCTION CREDIT ASSOCIATION, A CORPORATION, APPELLEE, V. WESTERN IOWA FARMS CO., A CORPORATION, DOING BUSINESS AS MACTIER COMMISSION COMPANY AND MACTIER BROS. LIVESTOCK SERVICE CO., APPELLANT.

440 N.W.2d 480

Filed June 2, 1989.    No. 87-186.

Victor J. Lich, Jr., and John M. Vodra, of Lich, Herold & Mackiewicz, for appellant.

Brad Roth, of Sennett & Roth, for appellee.

BOSLAUGH, WHITE, SHANAHAN, and FAHRNBRUCH, JJ., and WITTHOFF, D.J.

BOSLAUGH, J.

This is an action for conversion of cattle sold by the defendant, Western Iowa Farms Co., doing business as Mactier Commission Company and Mactier Bros. Livestock Service Co. The plaintiff, Broken Bow Production Credit Association (PCA), claimed a lien on the cattle under a security agreement executed by Waynard B. and Maxine L. Anderson.

The jury returned a verdict for the plaintiff in the amount of $15,261.90, and the trial court added prejudgment interest in the amount of $4,566.46. The defendant has appealed.

The record shows that on June 10, 1984, Tri- Co. Livestock Marketing Service, Inc. (Tri- Co.), shipped cattle to the Omaha stockyards that were consigned to the defendant, a commission merchant. The Andersons and their son, Daniel, own all of the capital stock in Tri- Co. The cattle which were shipped were branded with the "spear Z," or "arrow Z," brand, which is owned by the Andersons. The fact that the cattle sold by the

defendant bore the brand owned by the Andersons is the basis for the plaintiff's contention that the cattle were subject to the lien of the security agreement.

The record further shows that on June 3, 1984, the Andersons had shipped cattle to the Omaha stockyards that were consigned to the defendant, which were sold on June 5, 1984, and the proceeds sent to the Andersons. After the cattle had been sold, the plaintiff telephoned the defendant inquiring about the sale of any cattle owned by the Andersons. The defendant advised the plaintiff that a check had already been sent to the Andersons. The plaintiff requested that the plaintiff's name be included on checks from future sales of Anderson cattle.

The first question that must be determined is whether there was sufficient evidence for the jury to find that the cattle sold by the defendant on June 11, 1984, were owned by the Andersons. If the cattle were not the property of the Andersons, they were not subject to the lien of the plaintiff's security agreement.

Waynard Anderson testified by deposition that the cattle shipped to the defendant on June 10, 1984, were owned by Tri-Co., that Tri- Co. cattle were kept separate from his own cattle, and that separate records were maintained for the corporation. Tri- Co. cattle were financed by the Bank of Burwell and not by the plaintiff. Although Tri- Co. owned a brand known as "open box Z," or "three-quarter box open at the bottom Z," 99 percent of the cattle were branded with the spear Z brand because it was the clearest brand, it was well-known, and the "boys," who did 99 percent of the branding, probably were never told what brand to put on the cattle.

The bill of lading for the cattle shipped on June 10, 1984, is in evidence and shows "Tri Co. Livestock" as the owner.

When the cattle arrived in Omaha, they were not accompanied by a brand inspection certificate as required by Neb. Rev. Stat. § 54-143 (Reissue 1988). The defendant called the brand inspector in Omaha and asked him "to look very closely at that brand and make sure who owned the brand so we would have something in our records because we had been called by the PCA." The brand inspector inspected the cattle

and issued a certificate showing the cattle had been shipped by "Tri Co. Mark Ser" and that they carried the spear Z brand, which was owned by the Andersons. The certificate also had a notation: "PROCEEDS # HOLD FOR CLARIFICATION OF OWNERSHIP," which was crossed out. The brand inspector testified that he placed the notation on the certificate because the first brand book he looked at did not have a cross-reference, and he did not know that Waynard and Maxine Anderson were the president and vice president of Tri- Co. He then looked through his "supplementals" and found the cross-reference indicating that "it was one of the same people."

A certified copy of the original "Brand Inspector's Local Inspection Certificate" is in evidence. It shows the seller as "Trico Live Stock," the buyer as "Mac Tier," and the transaction authorized by "Tri Co Livestock Inc."

After the cattle had been sold, the defendant made out an account of the sale and placed a notation on it, "CHECK HELD BY BRAND INSP." After the hold had been released by the brand inspector, the notation was crossed out.

The defendant checked with the Packers and Stockyards Administration and determined that Tri- Co. was or had been a registrant under the act. The defendant then called Waynard Anderson and asked if the cattle were Tri- Co. cattle and if they had anything to do with the PCA. Anderson told the defendant that the PCA had nothing to do with these cattle and that they were financed at the Bank of Burwell. The defendant then added the Bank of Burwell to the check as a payee. The defendant's check for the proceeds from the sale of the cattle is in evidence and shows the check was deposited in the Bank of Burwell.

The defendant relies on Neb. Rev. Stat. § 54-109 (Reissue 1988), which provides:

> In all suits at law or in equity, in any criminal proceedings, or when determining the ownership of estrays as provided in subsection (21) of section 54-101 and sections 54-148, 54-150, 54-407, and 54-415, wherein the title to animals is an issue, the certified copy provided for in section 54-108, and other documentary evidence as provided in section 54-103, shall be prima facie evidence

of the ownership of such animals by the person possessing such animals.

When enacted in 1933, § 54-109 provided:

> In all suits at law or in equity, or in any criminal proceedings, wherein the title to animals is an issue, the certified copy provided for in [§ 54-108] shall be prima facie evidence of the ownership of such animal by the person whose brand or mark it may be.

In 1971, the Legislature revised the brand law and made significant changes in the language of the statute. Section 54-109 now refers to "the person *possessing* such animals" instead of the "person *whose brand or mark it may be*" as it did prior to the 1971 amendment. (Emphasis supplied.)

In *Bendfeldt v. Lewis*, 149 Neb. 107, 111, 30 N.W.2d 293, 295 (1948), we pointed out that "[t]he statute was enacted for the protection of the owners of the brands" and that "[a] brand on livestock is only prima facie evidence of ownership which may be rebutted." (Syllabus of the court.)

The effect of § 54-109 is not to create a true presumption of ownership, but to shift the burden of going forward with the evidence. "Prima facie evidence of ownership," as used in § 54-109, means that in the absence of other evidence, proof of ownership of the brand is sufficient to constitute a prima facie case which will withstand a motion for a directed verdict on that issue; but when evidence to the contrary is introduced, any "presumption" of ownership disappears and ownership becomes a question of fact to be determined by the preponderance of the evidence. See *McGowan v. McGowan*, 197 Neb. 596, 250 N.W.2d 234 (1977).

In 1971, the Legislature also included a sentence in Neb. Rev. Stat. § 54-101(2) (Reissue 1988) that provides: "A certificate of inspection shall be construed and intended to be documentary evidence of ownership on all cattle covered by such document."

There is no evidence other than the brand to support a finding that the cattle shipped to the defendant on June 10, 1984, were owned by the Andersons. At best, the brand was but prima facie evidence of ownership "by the persons possessing such animals," not the persons who owned the brand as the statute formerly provided. All of the other evidence supports a

finding that the cattle were owned by Tri- Co. and were not subject to the lien of the plaintiff's security agreement.

We conclude that the evidence was not sufficient to support a finding that the cattle shipped to the defendant on June 10, 1984, were owned by the Andersons and subject to the plaintiff's security agreement.

It is unnecessary to consider any of the other assignments of error.

The judgment is reversed and the cause remanded with directions to enter a judgment dismissing the petition.

REVERSED AND REMANDED WITH
DIRECTIONS TO DISMISS.

SHANAHAN, J., dissenting.

It is quite unlikely that any Nebraska stockgrower views a cattle brand as a meaningless mark rather than an indelible indicator for ownership of the animal bearing its owner's brand. Since today's decision is the first for this court's construction of Neb. Rev. Stat. § 54-109 (Reissue 1988), it is also equally improbable that anyone would have imagined the legislative distortion and subversion of the patent purpose of livestock brands.

Until today, some may have believed that only Frankenstein created a monster, at least those who had never examined § 54-109 (Reissue 1988) concerning a brand in relation to ownership of cattle. This court, like a loyal laboratory lackey, has assisted in loosing the monster in cattle country.

Before enactment of 1971 Neb. Laws, L.B. 323, § 54-109 explicitly provided that a cattle brand "shall be prima facie evidence of the ownership of such [branded] animal by the person whose brand or mark it may be." § 54-109 (Reissue 1968). Thus, before 1971, Nebraska had a sensible statute pertaining to ownership evidenced by a brand, a statute similar to those in other cattle-producing states; for example, the Wyoming statute which states:

A certified copy of any brand or mark recorded in the office of the board is prima facie evidence of ownership of animals branded or marked therewith for that species of livestock recorded by the board. The brand shall be received as evidence of ownership in all legal proceedings

involving title to the animal.
Wyo. Stat. § 11-20-108 (1977). See, also, Mont. Code Ann. § 81-3-105 (1987) (registered cattle brand is "prima facie evidence that the person, firm, or corporation entitled to use the mark or brand is the owner of animals on which it appears . . .").

In a review of the legislative history for the 1971 amendment of § 54-109, nothing reveals the anticipated improvement to be accomplished through amendment of the statute pertinent to ownership and brands, and, therefore, legislative intent regarding proof of ownership by brand is shrouded in Solonian silence. However, during a hearing before the Agriculture Committee of the Nebraska Legislature in 1971 concerning amendment of § 54-109, a representative of the Nebraska Brand Committee commented: "Over the years, as we enforced and detected violations of these [brand] laws, we've been forced to back off from any prosecution because some wording of the law makes this man technically innocent, while he has actually stolen or misappropriated someone's livestock." Agriculture Committee Hearing, L.B. 323, 82d Leg. 10 (Feb. 4, 1971). How unwittingly prophetic, for § 54-109, as amended in 1971, now provides that a cattle brand "shall be prima facie evidence of the ownership of such [branded] animals by the person possessing such animals," thereby reducing the statute to the absolute absurdity that possession is paramount proof of ownership for cattle. The Legislature's enactment of a statute bereft of rationality does not condone this court's collaboration and participation in such a legislative misadventure. Under the present § 54-109, some sidewindin' owlhoot could rustle someone's branded cattle and wind up as the owner by being caught with the critters—a result which is bad law, east or west of the Pecos, and which violates not only the Code of the Hills but common sense as well. Somebody better fetch the marshal.

Notwithstanding the nonsensical nature of § 54-109, the majority of this panel refuses to acknowledge the fundamental distinction between a presumption and prima facie proof. *McGowan v. McGowan*, 197 Neb. 596, 250 N.W.2d 234 (1977), contains this court's elaboration of some problems involving a presumption utilized in a trial:

A presumption is a standardized practice under which certain facts are held to call for uniform treatment with respect to their effect as proof of other facts. McCormick on Evidence (2d Ed.), § 342, p. 802. The same authority suggests that "presumption" is the slipperiest member of the family of legal terms, except its first cousin, "burden of proof." Reasons for the creation of presumptions are numerous and the treatment of presumptions also differs widely. There are at least eight senses in which the term has been used by courts. The former Nebraska approach to presumptions is ordinarily referred to as the "bursting bubble" theory. Under that approach when evidence was introduced to rebut the presumption, the presumption disappeared and the burden of proof or persuasion did not shift. Under such a rule whether a particular set of basic facts gave rise to the dignity of a presumption was ordinarily not critical in the matter of instructing a jury after trial. What was many times referred to as a "presumption" was often merely a permissible or probable inference, or was a method of indicating that the evidence was sufficient to withstand a motion for a directed verdict or to constitute a prima facie case.

197 Neb. at 603, 250 N.W.2d at 238.

Thus, a presumption is an assumption of fact required to be made from another fact or group of facts found or otherwise established in an action. For that reason, a presumption is procedurally and evidentially distinct from prima facie proof inasmuch as prima facie proof is evidence sufficient to submit an issue to the fact finder and precludes a directed verdict on the issue. See *State v. Copple*, 224 Neb. 672, 401 N.W.2d 141 (1987).

The prima facie case is used by the trier of law to decide whether a case is directed out of court at the close of the plaintiff's evidence or, instead, is suitable for the trier of fact. The presumption, on the other hand, is used by the trier of fact. When the trier of law finds that a presumption applies, it is passed along to the trier of fact.

Fenner, *About Presumptions in Civil Actions*, 17 Creighton L. Rev. 307, 312 (1984). The all-too-obvious point is that § 54-109

expressly relates to prima facie proof and does not mention or effect a presumption concerning ownership of cattle. Nevertheless, the majority of this court fails to discern the distinction between a presumption and prima facie proof.

The majority of the judicial panel reviewing this case attempts to support its position by underlining and emphasizing the peculiar language in § 54-109, namely, "the person *possessing* such animals." All the judicial underlining or underscoring cannot infuse intelligibility into an incomprehensible statute or absolve a statute of its profound absurdity.

If we accede to reason, as a court should, and put aside the legislative fiasco found in § 54-109, the evidence adduced in this case is sufficient to sustain the verdict for Broken Bow Production Credit Association. Without objection or restrictive purpose, exhibit 22, a copy of the "Brand Inspectors Local Inspection Certificate 38727 A16," was received in evidence, establishing that the Anderson Ranch at Milburn, Nebraska, was the inspection point for the cattle in question and designating "Trico Live Stock/Anderson Ranch" as the seller of the 30 heifers later sold by Mactier. As expressed in the brand inspector's certificate, the 30 heifers sold by Mactier bore the "↑Z" brand on their left shoulders. Additionally, again without objection or restriction, exhibit 21, a copy of the "Inspectors Tally and Local Certificate," identified the cattle sold by Mactier as follows:

| HFRS. | STEERS | BULLS | BRAND | OWNER | ADDRESS |
|---|---|---|---|---|---|
| 30 | | | ↑Z ls | Waynard and Maxine Anderson | Milburn |

The brand inspection certificates must be read in the light of Neb. Rev. Stat. § 54-101(2) (Reissue 1988), which in pertinent part provides: "A certificate of inspection shall be construed and intended to be documentary evidence of ownership on all cattle covered by such document." Undeniably and unfortunately, the majority of this court has overlooked, or elected to disregard, the presence of "Anderson Ranch" as a

seller and owner of the cattle designated in the brand inspectors' certificates. Also, Broken Bow PCA called James Pearman, a brand inspector for the Nebraska Brand Committee, who testified that "Waynard B. and Maxine Anderson" were the owners of "spear bar Z brand" on the cattle sold by Mactier and acknowledged that "the cattle were owned by Waynard and Maxine Anderson."

Consequently, there were exhibits and testimony that Andersons owned the cattle sold by Mactier. Such evidence required the district court to submit the Anderson ownership issue to the jury. By judicial alchemy in reverse or gone awry, the majority of this panel has transformed evidential gold into a base substance worthless for the jury's consideration. Whatever the ultimate weight of evidence placed before the jury, that evidence convinced a jury of 12 at the trial level, but, on appeal, the jury has increased to 16, resulting in an oligarchic verdict through the appellate process. The evidence supports the jury's finding that Andersons owned the cattle in question and necessitates affirmance of the verdict for Broken Bow PCA.