## No. 17,588.

W. WALTER BYRON *v.* YORK INVESTMENT COMPANY.
(296 P. [2d] 742)

Decided April 30, 1956.   Rehearing denied May 21, 1956.

Messrs. VAN CISE & VAN CISE, Mr. EDWIN P. VAN CISE, for plaintiff in error.

Mr. CHARLES L. FORD, for defendant in error.

*En Banc.*

MR. JUSTICE KNAUSS delivered the opinion of the Court.

PLAINTIFF in error was defendant in the trial court and will be referred to as defendant, or as Lessor, or by name. Defendant in error was plaintiff in the lower court and will be referred to as plaintiff, or as Lessee, or York. Irving J. Hayutin, a Denver lawyer, president of York, was a principal witness at the trial and was one of the Trustees-Mortgagees in a chattel mortgage hereafter mentioned. He will be referred to as Hayutin.

Plaintiff York leased from Byron certain mining properties in Summit County, Colorado. The written lease was dated April 2, 1951. At the same time the Lessee purchased certain mining machinery and equipment from Byron. The lease was drawn by Hayutin and provided

for a minimum monthly rent or royalty, a stated minimum number of work shifts per week and other provisions customary in a mining lease. The lease provided for a notice of sixty days in case of default with the right reserved to Lessor to terminate the lease and retake possession if such default was not corrected within that period. It also provided that in the event of forfeiture Lessee was to have sixty days time in which to remove its machinery and equipment, after which, unless otherwise agreed in writing, such machinery and equipment "shall be and become the property of the Lessor as liquidated damages."

The voluminous record before us (consisting of 1576 folios in the original record and 790 folios in a supplemental record) discloses that on July 25, 1951, Lessee executed its demand note in the sum of $39,600.00 and secured it by a chattel mortgage on its personal property at the Kimberly mine, the note being payable to Hayutin and his brother, as trustees for certain named individuals. On February 1, 1952, a new chattel mortgage was executed by Lessee embracing all of Lessee's property "now or hereafter acquired" on all of the mining properties. This mortgage was given to secure the indebtedness first above mentioned and was due on or before March 1, 1952, and was still unpaid on October 22, 1952, the date on which the matters in controversy arose.

On April 10, 1952, Lessor notified Lessee of certain defaults under the lease and stated his intention to take possession of the properties if the defaults were not corrected within sixty days. On June 23, 1952, the Lessor and Lessee agreed in writing that the lease "was considered terminated June 10, 1952, subject to the following reinstatement provisions." Then followed specific provisions providing for certain work to be done and payment made in full of all delinquent royalties on or before July 25, 1952. It was further specified that if these requirements were met by July 25, 1952, the lease

would be reinstated without penalty; if not complied with the Lessee would remove its machinery and equipment within sixty days thereafter unless otherwise agreed by the parties. On July 25th the required work had apparently been performed but the delinquent royalties had not been paid. On that date the Lessee paid Lessor $1,500 by a check on which was written "Delinquent royalties as per agreement. June royalty to be paid September 1, 1952." It was agreed that if all royalties were paid by October 1, 1952, the lease would be reinstated. Neither the June nor July 1952 royalty payments were made. Between October 5 and October 15, 1952, Hayutin removed some of the Lessee's machinery and equipment.

Byron was in Denver on October 21st and October 22, 1952. Early in the morning of October 22, 1952, at the direction of Lessee, five trucks arrived at the leased premises. The drivers of these trucks removed certain of the machinery and equipment from the structures in which they were housed, preparatory to loading it on the trucks and a portion thereof was loaded on one truck, preliminary to its removal from the mining properties. This operation was halted by the Sheriff of Summit County who held a distraint warrant for unpaid personal property taxes against the chattels. Hayutin, who was on the properties, went to the county seat and paid the taxes. After lunch that day a tractor was found in position across the road blocking the trucks which were still on the premises. The tractor belonged to Byron and was placed there by one Earl Smith at Byron's direction pursuant to a telephone conversation between Byron and his wife. The latter had informed Lessor by 'phone of the actions of Lessee. This tractor was on a private road inside the leased premises. Hayutin called Byron by telephone and the parties discussed their respective claims. Byron informed Hayutin that the machinery and equipment were his as liquidated damages pursuant to the terms of the written lease. Byron said he would be

in Kokomo at 6 P.M. that day and Hayutin agreed to wait for him to further discuss the matter. Byron at the same time talked to the sheriff. As a result, the tractor was removed and the partially loaded truck, as well as the other empty trucks, were allowed to pass down the road. Prior to the telephone conversation between Hayutin and Byron on October 22, 1952, and following the telephone notification by Byron's wife that Lessee was attempting to remove the machinery and equipment, Byron, who apparently did not know that Hayutin was at the mine, sent a telegram to Hayutin at his Denver law office in which he told Hayutin that he understood an attempt was being made to remove the equipment. He advised Hayutin that he had no rights on the premises. He said: "As Attorneys for yourself and York Investment Co. you are well aware that you have two choices, legal*ly* (sic) payment of rents due and for damages done or to bring suit for replevin." This telegram was sent by Byron from the Cosmopolitan Hotel in Denver.

On October 24, 1952, York sent a registered letter to Byron in which it was said: "Yesterday you advised us that you would send us a written proposal re your demands. Your action is preventing us from delivering mortgaged property to the mortgagee, pursuant to an agreement between the mortgagor and mortgagee to accept the property in full payment of indebtedness covered by a promissory note secured by a recorded chattel mortgage. If we are to avoid a deficiency under our note and mortgage, we must make delivery at once. Will you therefore send us your proposal as quickly as possible."

On October 27, 1952, Byron replied to this letter stating: "In response to your letter of October 24th, you are advised that it is necessary for us to have the Kimberly and Sellers mines examined by a competent engineer to determine the extent of damage which has accrued to the property during the term of your lease, and also an

inspection of the mining equipment located on said premises. As soon as the inspection is complete, which we hope will be some time this week, we will be in a position to confer with you regarding the matter."

Only one conclusion can be reached when we read the written communications which passed between the parties, and that is that under the lease Byron thought he had a lien on the machinery and equipment for past due rent or royalty, taxes and damages, and that because the Lessee had not removed the property within the sixty day period he, Byron, under the lease written by Hayutin, became the owner of the machinery and equipment as liquidated damages. York's letter of June 23, 1952, definitely stated that if Lessee did not comply with the terms of the lease by July 25, 1952, it would "remove its property within sixty days thereafter unless otherwise agreed upon."

The chattel mortgage mentioned in the York letter of October 24, 1952, was introduced in evidence, but the holders of the note secured thereby were not parties to this action.

The present action was commenced on November 10, 1952. In its complaint York alleged its ownership and possession of the machinery and equipment; it alleged that defendant converted this property. $35,000.00 damages were prayed for. Defendant, by answer, denied the conversion; set up the lease, non-compliance with its terms on the part of Lessee and its failure to remove the property within the sixty day period, together with other matters which constituted a counterclaim against Lessor. Trial was to a jury which returned a verdict for Lessee in the sum of $21,000 against Lessor and another on the counterclaim in favor of Lessor and against Lessee in the sum of $1,000. From the judgment entered on the verdict against him, Lessor brings the cause here on writ of error.

It should here be noted that present counsel for Lessor did not participate in the trial of this case. The trial

consumed several days during which the trial judge displayed remarkable patience, notwithstanding counsel on both sides injected, or attempted to inject into the case, matters which were entirely immaterial to the issues involved.

At the close of Lessee's case counsel for Lessor moved for dismissal of plaintiff's complaint. This motion was denied, as was a similar motion interposed at the conclusion of the trial.

We are of the opinion that the motion made at the conclusion of Lessee's case, should have been granted. Under this record the Lessor had possessory rights superior to those of Lessee. The last agreement between the parties terminated on October 1, 1952, and subsequent to that date Lessee had no rights in the leased premises. Lessor was in possession of the premises and this possession continued without interruption up to the time of trial, except for one day, October 22, 1952, when certain chattels were removed. Defendant Lessor had not used the chattels or done anything with them except to safeguard them.

■ ■ Conversion is any distinct, unauthorized act of dominion or ownership exercised by one person over personal property belonging to another. A mere breach of contract will not support an action of trover. An action for damages for the conversion of personal property cannot be maintained unless plaintiff had a general or special property in the personalty converted, coupled with possession or the immediate right thereto. *Dorris, Constable v. San Luis Valley Finance Co.*, 90 Colo. 209, 7 P. (2d) 407; *McLagen v. Granato*, 80 Colo. 412, 252 Pac. 348; *Lininger Implement Co. v. Queen City Foundry Co.*, 73 Colo. 412, 216 Pac. 527.

■ ■ The record here shows that the lease, drawn by plaintiff's manager and attorney, carefully provided that upon default and termination the plaintiff would have sixty days within which to remove its machinery and equipment from the mine property and upon failure

to do so it was to become the property of defendant as "liquidated damages." The lease had been terminated and the sixty day period for removal had elapsed when the plaintiff attempted to remove the machinery and was prevented from doing so by the defendant. Under such circumstances can it be said that defendant's action amounted to a distinct unauthorized act of dominion or ownership which would support an action for conversion? We think not. The negotiations of the parties resulting in the lease agreement, the precise terms of which were prepared by plaintiff and by which it bound itself, preclude the plaintiff from maintaining the present action. The wrong of which a defendant must be shown to be guilty before an action for conversion is justified, must be done under such circumstances as will not excuse the wrongdoer. A mere temporary exclusion of plaintiff from possession of his property will not give rise to an action for conversion.

Here it is admitted that the chattel mortgage on the machinery was in default; Hayutin advised defendant that he wanted to turn the property over to the mortgagee in order to avoid a deficiency judgment against the makers of the note secured by the chattel mortgage.

In *McCormick v. Bank,* 88 Colo. 599, 299 Pac. 7, we said: "When the note was not paid a default occurred whereby the right of possession by the terms of the mortgage became forfeited to, and vested in, the mortgagee. The defendant bank, having the legal title under the chattel mortgage from the beginning, and an additional right to possession of the mortgaged chattels upon default of the mortgagor to pay, acquired the full ownership and had the exclusive right of possession to the mortgaged goods, subject only to the right of the mortgagor, or his legal representatives, to the right of redemption or for an accounting of the proceeds of the mortgaged property."

The right of a person to maintain trover for the conversion of property taken from land depends on the

possession of the land from which the property was taken. To be authorized to sue, it is necessary and sufficient that plaintiff shall have had, at the time of the alleged conversion, either actual possession or title and constructive possession or a right to possession of the land from which the property was taken. 65 C.J. 61. See, also, *Davis v. Patterson,* 69 Colo. 226, 193 Pac. 662.

*Martin v. Sykes,* 38 Wash. 2d 274, 229 P. (2d) 546, is a case in point. There a defendant landlord had leased a dairy farm and sold a milking machine to the plaintiff tenant. Plaintiff mistakenly thought a pipeline to the machine had been included in his purchase. On termination of the lease the landlord, hearing that the tenant was about to remove not only the milking machine but also the pipeline, instituted proceedings in a Justice Court and in his complaint the landlord claimed to be the owner of the machine as well as the installations. The tenant was arrested and after conference with the Justice of the Peace agreed to leave things in status quo. When the tenant was moving he refused to take the milking machine and treated it no longer as his property. He then instituted a conversion action against the landlord. The tenant recovered in the trial court. On appeal the judgment was reversed and the cause dismissed. The Supreme Court of Washington said:

"In spite of all the talk of 'dominion,' the question of whether or not the defendant, or someone else acting through his agency or on his behalf, has taken actual or constructive possession, would seem, in most cases, to provide the real key to the problem. It is true that, even if this has occurred, there may still have been no conversion; but it can probably be said with safety that, if it has not, there has certainly been none.

\* \* \*

"Was there actually conversion in this case? Careful study of the authorities discussed above, discloses that the answer must be no. True, Martin's (Plaintiff's) right to control his milking machine was, to a certain extent,

interfered with; in a manner of speaking, the deputy sheriff exercised dominion over it, as did Judge Wright when he told them to leave everything 'in status quo.' But the dominion which they exercised was not of the character necessary to constitute a conversion. This case, of course, contains an additional element, not present in the others; the threat of arrest, which the trial court appears to have regarded as decisive of the matter. That, however, effected no change.

" 'A man may be compelled by threats, or even by physical coercion, to forego the full exercise of his own dominion as owner, yet if the wrongful act falls short of a disseisin of the property, the wrongdoer is not guilty of a conversion.' 1 Street, Foundations of Legal Liability, 236.

\* \* \*

"The determining factor in the situation is that neither the deputy nor anyone else at any time or in any manner took possession, actual or constructive, of the milking machine. There was no "dealing" with the chattel in a manner inconsistent with Martin's rights. \* \* \* An essential element of the tort of conversion was consequently absent."

The instant case is strikingly similar to *Martin v. Sykes, supra.* There the warrant was served by the deputy sheriff, a complaint claiming ownership of the milking machine in the landlord was filed, and the order of the Justice of the Peace that matters stand in status quo find their counterparts in the tractor road block, the telegram of October 22, 1952, sent by Byron to Hayutin, and the direction of the sheriff that the machinery and equipment be not removed from the premises. We are convinced that the instant case must be governed by the rule laid down in *Martin v. Sykes, supra.* See, also, *Winchester v. Joslyn,* 31 Colo. 220, 72 Pac. 1079.

Exhibit 4 in the instant case was a letter contract signed by both parties. It specified that the "lease was considered terminated June 10, 1952." It provided that

certain work should be completed by July 25, 1952, and payment made before that date of the full delinquent royalties. It further provided that if the "above provisos are not met by July 25, 1952, then the York Investment Company shall remove its property within sixty days thereafter unless otherwise agreed upon." There was no further agreement and the provisos have not been complied with. Under these circumstances Lessor, who throughout the trial contended that his properties had been damaged by Lessee, claimed the right to retain the chattels as liquidated damages as of September 25, 1952; the expiration of the sixty day period. Lessor, whatever his rights were, did not have to exercise them immediately on September 25, 1952. We are not called upon to determine the rights of the chattel mortgagees as against Lessor.

A careful reading of the record fails to convince us that Lessee established the value of the property alleged to have been converted. Hayutin was the only witness who attempted to furnish specific evidence as to value, and he did this by producing Exhibit "G" which he testified was a summary of the bills of sale and invoices of the chattel property in another exhibit. Over objection, Exhibit "G" was admitted in evidence subject to identification of each item as having been left on the premises at the time of the alleged conversion. There are numerous inconsistencies and errors in the adding machine tape which was a part of Exhibit "G" as a total of the items embraced in the exhibit. As we read the record there are errors or unidentified items aggregating several thousand dollars in this exhibit, all of which are against the Lessor.

The cost price of chattels must be related to the condition of the property at the time of the alleged conversion. The record is strikingly void of evidence to establish the condition of this property (with a few exceptions) on October 22, 1952. The witness Hayutin was

not a qualified witness on mining matters. He was the manager of the York Investment Company, and a practicing attorney. His qualifications as a mining man or one versed in the value and condition of mining machinery were not established. It is true that Lessor produced certain witnesses claimed to be experts, but these individuals were allowed to testify on the supposition that the equipment and machinery were in "good used condition."

■ Conversion, which is in effect a forced purchase of chattels, is a harsh and drastic remedy. It is a very special remedy which plaintiff seeks, and under the facts as disclosed by this record was not available to plaintiff. While the parties were still discussing the matters in controversy and less than three weeks after the tractor was placed across the road, Lessee precipitated this action which, as we have said, consumed day after day of trial. As we view this record Lessee acted hastily and without giving Lessor an opportunity to complete his investigation. Lessee sought to force Lessor to buy the machinery by the technical claim that its property had been converted. We think it is not entitled to this relief. The judgment is reversed, the cause remanded to the trial court with direction to enter judgment dismissing plaintiff's complaint.