**Larry CORNELIUS and William High, doing business as City Lights Partnership, Plaintiffs-Appellees,**

**v.**

**GERWIN AND COMPANY, Defendant-Appellant.**

**No. 81CA0193.**

Colorado Court of Appeals, Div. II.

Feb. 18, 1982.

No appearance for plaintiffs-appellees.

Harry A. King, Omer Griffin, Denver, for defendant-appellant.

VAN CISE, Judge.

Defendant, Gerwin & Company (Gerwin), appeals a judgment entered in favor of plaintiffs, Larry Cornelius and William High, for the conversion of $10,000 of plaintiffs' money by Terrance Hogan, an employee of Gerwin. We affirm.

Gerwin & Company is licensed as a broker-dealer in Colorado and other states, by the National Association of Securities Dealers and by the United States Securities and Exchange Commission. Engaging in the investment banking business in Colorado and other states, it deals exclusively in municipal bonds and other tax-exempt securities and in the business of underwriting tax-free securities of municipalities and other government agencies. It also counsels municipalities and agencies on matters of debt financing. It does not buy or sell or otherwise deal in stocks, bonds, or other obligations of corporations, in real estate or interests therein (other than for its own account), or in partnerships or interests therein.

Plaintiffs were completely unsophisticated investors. Neither had ever had any stocks, bonds, or other securities, and had never dealt with or been in an office of a security broker or dealer prior to the time of the incident at issue.

Plaintiffs became acquainted with Hogan when they were all previously employed at a Denver restaurant. On learning Hogan was now in the municipal bond business with Gerwin, they called Hogan about the possibilities of municipal bond financing on a real estate renovation project of theirs. An appointment was made to meet with Hogan on January 2, 1980, at his office at Gerwin & Company.

On the scheduled date, plaintiffs went to Gerwin's main office on the top floor of the First National Bank Building in Denver. There, they were met by the receptionist. While waiting in the reception room, they looked at a Gerwin color-printed brochure which contained a picture of Hogan. They were then conducted by the receptionist to

Hogan's private office. It was a medium-sized, furnished office, carpeted, with ceiling to floor windows and an imposing view of the mountains. Hogan was well dressed and looked prosperous. He gave them one of his business cards showing his association with Gerwin.

After a general discussion, they arranged to meet for lunch January 4. At that luncheon meeting, while talking about bond financing for renovating run-down buildings, Hogan loaned them a copy of a book published by Gerwin entitled "Industrial Development Bond Financing in Colorado, the Gerwin & Company Approach, by Terrance R. Hogan." Hogan then mentioned that Gerwin was involved in municipal bond financing on an old building in lower downtown Denver, which was owned by a limited partnership, and that one of the partners wanted to sell his 10% interest for $25,000. Hogan then drove plaintiffs to the site in his new Thunderbird, and they viewed the premises.

On January 5, plaintiffs met with Hogan at his home. When plaintiffs told Hogan they could raise only $10,000 at this time, but expected other funds to be available soon, Hogan said he would loan them the balance. The transaction was then set for closing in Hogan's office at Gerwin on the 7th.

On January 7, plaintiffs went to the bank and, pursuant to Hogan's instructions, bought a cashier's check made payable to the person whose interest they were purchasing. They proceeded to the Gerwin offices where they were once again conducted to Hogan's office by the receptionist.

Hogan showed them a letter notice of a partnership meeting scheduled for January 21, some Gerwin information sheets on housing, tax shelters, and municipal bonds, and data on Denver bonds. Hogan then told them the closing had been postponed, and would be held the next day at the office of the seller's attorney. He gave them a handwritten memo on Gerwin stationery showing the time, date, and place of the closing, along with one of the attorney's business cards. At the same time, he requested that they leave the cashier's check with him as he needed it to show the seller that plaintiffs were "serious."

He agreed to keep it in Gerwin's safe overnight and to take it to the closing the next day. They then turned over the check to Hogan, and he gave them a receipt for it. Also, a typed loan agreement for the $15,000 balance was signed by plaintiffs and Hogan at this time.

On January 8, plaintiffs went to the attorney's office for the scheduled closing. Hogan was not there, the money was not there, and no one knew anything about any closing. As stated by the court, "Mr. Hogan ran off with 10,000 bucks."

Plaintiffs sued Gerwin, as Hogan's employer, for their loss. The court determined that Hogan had no actual authority to sell limited partnership interests, had no license to sell such interests, and, in fact, his employer, Gerwin, did not deal with such investments. However, based on the evidence, and particularly on the fact that Hogan had a private office provided to him in the suite occupied by Gerwin, the court held that Hogan had apparent authority to do what he undertook to do and that plaintiffs were justified in believing Hogan had that authority. It then entered judgment for plaintiffs.

■ Contrary to Gerwin's contention on appeal, based on this evidence, we agree with the conclusions of the trial court. Under the circumstances of this case, not only were the plaintiffs reasonably justified in believing that Gerwin had authorized its employee, Hogan, to engage in this transaction, but also Gerwin held him out to the public, including plaintiffs, as having that authority. *Bowser v. Union Bag Co.*, 112 Colo. 373, 149 P.2d 800 (1944); *Russell v. First American Mortgage Co.*, 39 Colo.App. 360, 565 P.2d 972 (1977).

■ Gerwin contends that the trial court erred in admitting the customers' memo of the cashier's check which was given to Hogan. We disagree. The customers' memo of the check was introduced into evidence "for the purpose of showing that they did

purchase a cashier's check, not that this is the cashier's check, or what subsequently happened to it." Since the content of the check was not in issue, we find no error.

 Gerwin finally contends that the evidence is insufficient to prove conversion of the $10,000 by Hogan. We disagree.

Conversion is any distinct unauthorized act of dominion or ownership over the personal property of another. *Bryon v. York Investment Co.*, 133 Colo. 418, 296 P.2d 742 (1956). Here, the evidence showed that plaintiffs withdrew $10,000 in the form of a cashier's check and delivered it to Hogan and that he gave them a receipt for that amount. Both plaintiffs testified that the $10,000 has never been returned to them. Finally, Hogan left town after receiving the cashier's check and has not returned.

Judgment affirmed.

ENOCH, C. J., and KELLY, J., concur.