Brian **RAITZ** and Tristan Naranjo, Petitioners,

v.

**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY,** Respondent.

No. 97SC446.

Supreme Court of Colorado, En Banc.

June 8, 1998.

---

Greenstein and Tyler, P.C., Cameron W. Tyler, Bruce W. Sarbaugh, Boulder, for Petitioners.

Anderson, Campbell and Laugesen, P.C., Robert L. McGahey, Jr., Dwianne S. Ladendorf, Denver, for Respondent.

Justice MARTINEZ delivered the Opinion of the Court.

We granted certiorari in *Raitz v. State Farm Mutual Automobile Insurance Co.*, 944 P.2d 657 (Colo.App.1997), to determine whether, once a named insured of an automobile liability insurance policy consents to another's use of the insured vehicle, the Colorado Auto Accident Reparations Act, *see* §§ 10–4–701 to –726, 3 C.R.S. (1997) ("No–Fault Act" or "Act"), requires coverage for subsequent permittees.[1] The court of appeals reversed the trial court's determination that petitioner Tristan Naranjo was entitled to personal injury protection ("PIP") benefits for injuries he sustained while occupying a van described in an insurance policy issued by respondent, State Farm Mutual Automobile Insurance Company ("State Farm"). The court of appeals held that coverage for Naranjo's injuries was not required because the driver of the van, Brian Raitz, was not an "insured" under the Act. *See Raitz,* 944 P.2d at 659–60. We hold that, under the initial permission rule, subsequent permittees ordinarily use the insured vehicle with the implied permission of the named insured. We further conclude that Raitz was an "insured" and that Naranjo therefore occupied the van with the permission of an insured. Accordingly, we reverse the decision of the court of appeals.

## I.

Naranjo's claim arose out of an accident involving an older model Dodge van owned by James and Margaret Dahlin ("the Dahlins"), who are the named insureds under an automobile policy covering the van and issued by State Farm. The Dahlins gave their daughter, Kristin, general permission to drive the van. Although James Dahlin told Kristin that she was not to let others drive the van,[2] it is undisputed that Kristin had, on several occasions, permitted others to operate the vehicle.

On October 24, 1992, Kristin drove the van, accompanied by several friends, to a party at the residence of Tim Lemley. At the party, Kristin and her friends consumed an indeterminate amount of alcohol. Some time later, Kristin's boyfriend, Alan Angelopulous, sought Kristin's permission to use the van in order to get some food. In his deposition, Angelopulous testified that he found Kristin asleep downstairs in the Lemley house, woke her, and asked her for the keys to the van so he and some other partygoers could go to a restaurant. Angelopulous further testified that Kristin woke up, saw that it was Angelopulous making the request, and handed the keys to him.[3]

---

**1.** We granted certiorari to consider:

Whether the court of appeals erred in ruling that the Colorado Automobile Accident Reparations Act does not make no-fault medical and rehabilitation insurance coverage compulsory for an occupant of an insured vehicle, where an insured gave permission for the vehicle to be driven, and where the occupant and driver were not converters of the vehicle.

**2.** By affidavit James Dahlin stated that, over a year prior to the accident, he had told Kristin not to let anyone other than family members drive the family cars.

**3.** In her own deposition testimony, Kristin testified that she had no memory of giving Angelopulous the keys to the van. She also testified that, on prior occasions, she had allowed Angelopulous to drive the van and that she "trusted" Angelopulous.

Angelopulous, Raitz, Naranjo, and one other person left the Lemley house in the van, with Naranjo driving. Later, Naranjo and Angelopulous decided to ride on the roof of the van while Raitz drove. Shortly thereafter, the van hit a drainage gutter, causing Naranjo to fall from the roof and suffer serious injuries.

Raitz, acting under an assignment of rights from Naranjo, subsequently brought this action against State Farm in Jefferson County District Court, alleging that Naranjo was entitled to PIP benefits under the terms of the Dahlins' insurance policy and the No-Fault Act. Both Raitz and State Farm subsequently filed motions for summary judgment on the issue of whether Naranjo was entitled to PIP benefits.

The trial court granted summary judgment in favor of Raitz.[4] The court found that "Kristin had express permission [from the Dahlins] to drive the Dodge van." The court also found that, because Kristin "willingly" gave the keys to Angelopulous "without reservation," Angelopulous is an "insured" under the No–Fault Act. Relying on *Bukulmez v. Hertz Corp.*, 710 P.2d 1117 (Colo.App. 1985), *rev'd in part on other grounds sub nom. Blue Cross v. Bukulmez*, 736 P.2d 834 (Colo.1987), the court concluded that coverage was mandated under the Act because there was "no converter involved in this case" and no allegation that Naranjo was hurt by his own intentional act.

State Farm subsequently filed a motion for reconsideration, arguing that our decision in *McConnell v. St. Paul Fire & Marine Insurance Co.*, 906 P.2d 109 (Colo.1995), which was announced after the trial court issued its summary judgment order, compelled a different result. Upon reconsideration, the trial court reaffirmed its prior ruling, finding that there was a "chain of consent ... from the named insured to Kristin Dahlin to Angelopulous to Raitz," and that "[t]here is no suggestion, much less evidence, that Raitz was a converter of the automobile, as was the case in [*McConnell*]." The court stated that

the rationale of *Bukulmez* was controlling, and that "[t]he legislative purposes of the [No–Fault] Act can only be carried out if consensual uses, even those with casual, informal or implied consent, are covered by PIP insurance policies."

The court of appeals reversed and remanded the case to the trial court with directions that it enter summary judgment in favor of State Farm. *See Raitz*, 944 P.2d at 660. The court of appeals determined that, because there was no evidence in the record indicating that the Dahlins or Kristin expressly permitted Naranjo to operate or occupy the van while Raitz was driving, "Naranjo's use as a passenger was 'necessarily dependent' on the status of the driver, Raitz...." *Id.* at 659. The court of appeals further determined that Raitz was not an "insured" under the Act because the person from whom he received permission to drive the van, Angelopulous, did not have lawful authority to permit others to drive the vehicle. *See id.* at 660. The court of appeals reasoned that, "even if Angelopulous had the status of a permittee," he was not an "insured" under the Act because he was not "a named insured, a resident relative of a named insured, or a person using the vehicle with the permission of the named insureds...." *Id.* at 659 (citing § 10–4–703(6), 4A C.R.S. (1994)). In reaching this conclusion, the court of appeals expressly rejected the argument that the initial permission rule, adopted by this court in *Wiglesworth v. Farmers Insurance Exchange*, 917 P.2d 288 (Colo.1996), is applicable to the facts of this case. *See Raitz*, 944 P.2d at 660. According to the court of appeals' opinion, the initial permission rule as set forth in *Wiglesworth* only "pertains to the scope of use by the initial borrower," and does not give "an initial borrower unfettered authority to allow third parties to use or drive the vehicle and be considered insureds." *Raitz*, 944 P.2d at 660.

## II.

The petitioners argue that the court of appeals erred by restricting application of

---

4. The court subsequently granted Raitz's motion to add Naranjo as a party. The court later determined, however, that the assignment from Naranjo to Raitz was invalid, and vacated the summary judgment order in favor of Raitz. The court also concluded that the "rationale" of that order supported Naranjo's claims, and therefore granted summary judgment in favor of Naranjo.

the initial permission rule to the initial borrower, or "first permittee," of the vehicle. According to the petitioners, mandatory coverage under the Act extends to all subsequent permittees where permission has been given to drive the insured vehicle on public highways, and the exclusions contained in section 10–4–712, 3 C.R.S. (1997), do not apply. Thus, the petitioners maintain that, where there is a chain of consent from a named insured [5] to a subsequent permittee, the permittee is an "insured" under the Act. We agree that a chain of consent is sufficient for coverage under the Act.

The No–Fault Act provides that "[e]very owner of a motor vehicle who operates the motor vehicle on the public highways of this state or who knowingly permits [such] operation ... shall have in full force and effect a complying policy under the terms of [the Act]...." § 10–4–705(1), 3 C.R.S. (1997). The purpose of the Act, as expressed in the legislative declaration,

> is to *avoid inadequate compensation to victims of automobile accidents;* to require registrants of motor vehicles in this state to procure insurance covering legal liability arising out of ownership or use of such vehicles and also providing *benefits to persons occupying such vehicles and to persons injured in accidents involving such vehicles.*

§ 10–4–702, 3 C.R.S. (1997) (emphasis added). Specifically, the Act mandates coverage for accidental injury sustained by any person occupying an insured vehicle with the consent of an insured. *See* § 10–4–707(1)(c), 3 C.R.S. (1997); [6] *McConnell,* 906 P.2d at 112. However, the Act does not require coverage where one of the statutory exclusions applies. Pursuant to section 10–4–712(2), coverage may be excluded where the injured person

(a) Sustains injury caused by his own intentional act; or

(b) Is operating a motor vehicle as a converter without a good faith belief that he is legally entitled to operate or use such vehicle.

§ 10–4–712(2), 3 C.R.S. (1997).[7] The Act defines an "insured" as "the named insured, relatives of the named insured who reside in the same household as the named insured, or any person using the described motor vehicle with the permission of the named insured." § 10–4–703(6), 3 C.R.S. (1997).

In *Wiglesworth,* the named insureds, the Smiths, gave permission to Wiglesworth to use the insured truck to drive to and from work, but told Wiglesworth that any other use required additional, express permission. *See* 917 P.2d at 289. On the date of the accident, "Wiglesworth left the Smiths' home ... under the auspices of going to work," but instead used the truck in a "drag race" with another vehicle. *Id.* at 290. A passenger in

---

5. The named insured in an insurance policy is "the person specifically designated in the policy as the one protected and, commonly, it is the person with whom the contract of insurance has been made." *Black's Law Dictionary* 1023 (6th ed. 1990).

6. Section 10–4–707(1)(c) provides that coverages described in section 10–4–706, 3 C.R.S. (1997), are applicable to:

(c) Accidental bodily injury arising out of accidents occurring within this state sustained by any other person while *occupying* the described motor vehicle *with the consent of the insured* or while a pedestrian if injured in an accident involving the described motor vehicle. (Emphasis added.) The term "occupying" in section 10–4–707(1)(c) includes "any person who is in or upon a vehicle, or who has begun the immediate act of entering into or alighting from a vehicle." *Rose v. Allstate Ins. Co.,* 782 P.2d 19, 24 (Colo.1989).

7. A *policy provision that excludes from coverage persons occupying insured vehicles with the con-* sent of an insured is thus invalid because policy provisions may not dilute, condition, or limit statutorily mandated coverage. *See Terranova v. State Farm Mut. Auto. Ins. Co.,* 800 P.2d 58, 60 (Colo.1990). Here, the policy issued by State Farm provides that an "insured" includes the named insured, relatives, "or any other person who sustains bodily injury while occupying [the named insured's] car ... with the consent of [the named insured] or a relative...." As the court of appeals noted, "neither party argues that the relevant coverage provided under the insurance policy differs from the coverage required by the No Fault Act." *Raitz,* 944 P.2d at 658; *see Winscom v. Garza,* 843 P.2d 126, 128 (Colo.App. 1992) (policy provision limiting coverage to permissive users is valid because Act does not require insurer "to extend coverage to any person who uses the vehicle without the permission of the named insured"). Thus, our inquiry is limited to examining the coverage required by the Act.

the other vehicle sustained severe injuries after the vehicle in which he was riding ran a red light and collided with a truck. *See id.*

In determining that the passenger was entitled to PIP benefits under the Smiths' policy, we adopted the initial permission rule enunciated in *Bukulmez,* and held that "once the owner of a vehicle expressly or impliedly gives the driver permission to operate the vehicle, subsequent changes in the character or scope of the use do not require additional, specific consent." *Wiglesworth,* 917 P.2d at 291. We further determined that, under the rule, even where a named insured places restrictions on the scope of the permitted use of a vehicle, coverage is nonetheless required unless "the deviation from the permitted use rises to the level of theft or conversion." *Id.* Thus, despite the fact that Wiglesworth had violated the Smiths' explicit instructions, we concluded that Wiglesworth's use was "permitted" for purposes of the Act because "all that is required [under the Act] to confer coverage on the driver of the vehicle is initial permission from the primary insured to use the vehicle." *Id.* at 292.

State Farm, like the court of appeals below, argues that *Wiglesworth* is distinguishable because *Wiglesworth* involved only a first permittee and not subsequent permittees. *See Raitz,* 944 P.2d at 660. We are not persuaded.

The fact that Wiglesworth was a first permittee was not critical to our holding in that case. Rather, we liberally construed the phrases, "with the permission of the named insured," and "knowingly permits," in order to further the Act's remedial and beneficent purposes. *See* 917 P.2d at 290–91; *see also Regional Transp. Dist. v. Voss,* 890 P.2d 663, 669 (Colo.1995) ("The No–Fault Act 'is to be liberally construed to further its remedial and beneficent purposes....'" (quoting *Travelers Indem. v. Barnes,* 191 Colo. 278, 283, 552 P.2d 300, 304 (1976))). Because the purpose of the Act is to compensate accident victims, we rejected the proposition that permission of a named insured for a particular use may not be implied from the general permission to use the vehicle, even when the named insured has placed express restrictions on the use of the vehicle. *See id.* at 291. We therefore determined that, "because ... the Smiths gave Wiglesworth the keys to their truck and informed him that he could drive the truck to work without asking for further permission ... Wiglesworth had the initial permission ... necessary to trigger the insurance protection required by the Act." *Id.* at 292.[8]

■ Given our holding in *Wiglesworth* that the use of a vehicle is "permitted" under the Act even when the named insured has not expressly allowed such use, it would be incongruous to hold that no subsequent users of the vehicle have permission from the named insured to use the vehicle unless such permission is expressly given. In light of the remedial policies underlying the Act, we see no principled reason why the term, "permission," should be given a narrower construction than that given in *Wiglesworth* when considering whether subsequent permittees have the implied permission of the named insured to use the vehicle.[9] As the New Jersey Supreme Court stated in *Odolecki:*

---

**8.** We also note that *Bukulmez* involved a factual situation more analogous to the present case than to *Wiglesworth.* In *Bukulmez,* the owner of a rental vehicle rented it to a father, who subsequently allowed his son to drive it in direct violation of the terms of the rental agreement. *See* 710 P.2d at 1119. The son was later involved in an accident causing serious injuries to the plaintiff, a passenger in the car.

In determining that coverage for the passenger's injuries was required, the court of appeals in *Bukulmez* expressly rejected the proposition that the initial permission rule is inapplicable to permittees who do not receive express permission from the named insured to drive the vehicle:

We do not construe § 10–4–705 to require that the owner have knowledge and give permis-

sion to each individual who will be driving the car on public roads before coverage under the Act becomes compulsory. Rather, once the owner has knowledge that the car will be driven on public highways and gives permission for it to be so driven, coverage is mandated unless the exclusions of § 10–4–712, C.R.S., apply.

*Id.* at 1120 (quoted in *Wiglesworth,* 917 P.2d at 291).

**9.** Although a number of states have applied more restrictive tests in determining whether a subsequent permittee uses the insured vehicle with the implied consent of the named insured, the vast majority of jurisdictions that have adopted the initial permission rule agree that, by giving gen-

We fail ... to see the distinction between a case where a first permittee exceeds the scope of permission in terms of time, place, or purpose, and a case where he exceeds the scope of permission in terms of use of the vehicle by another. Once an owner voluntarily hands over the keys to his car, the extent of permission he actually grants is as irrelevant in the one case as in the other.... [O]nce the initial permission has been given the named insured, coverage is fixed, barring theft or the like.

264 A.2d at 42; *see also United Servs.*, 891 P.2d at 541 ("[I]t is as likely that a son or daughter will violate a parent's instruction not to let someone else drive as it is that the youngster will violate an instruction not to speed or not to deviate from a specific purpose or course of travel."). Therefore, under the Act, just as a named insured impliedly permits uses of an insured vehicle which were not specifically authorized when granting permission to an initial borrower, he or she also impliedly consents to the use of the vehicle by subsequent permittees.[10]

Our decision in *McConnell* is not to the contrary. In *McConnell*, the driver of the insured vehicle, Brewer, knew that both the named insured, James Dart, and the initial borrower, his daughter Jean Dart, had prohibited Brewer from driving the vehicle. *See* 906 P.2d at 110–11. Despite these admonitions, Brewer drove the car and was involved in an accident. The plaintiff, who was injured while riding as a passenger in the vehicle, argued, *inter alia*, that because James Dart consented to the car being driven by his daughter, he thereby consented "to the vehicle being driven ... by anyone other than himself or herself." *Id.* at 114.

We rejected the plaintiff's argument because "Brewer ... was specifically instructed not to use the car" by both James and Jean Dart. *Id.* at 115. Because Brewer knew that he did not have permission from either the named insured or "one using the car with the permission of the named insured," *McConnell*, 906 P.2d at 115, he was a converter without a good faith basis to believe that he was legally entitled to operate the vehicle. *See* § 10–4–712(2)(b). Brewer therefore was not an "insured" pursuant to section 10–4–703(6), and the plaintiff was excluded from coverage because she did not ride in the vehicle with the consent of an insured. *See* § 10–4–707(1)(c); *McConnell*,

---

eral permission to another to use the vehicle, the named insured also delegates the authority to permit others to use the vehicle. *See, e.g., Maryland Cas. Co. v. Iowa Nat. Mut. Ins. Co.*, 54 Ill.2d 333, 297 N.E.2d 163, 168 (1973) (once initial permission has been given by named insured, coverage extends to subsequent permittees); *State Farm Mut. Auto. Ins. Co. v. D.F. Lanoha Landscape Nursery, Inc.*, 250 Neb. 901, 553 N.W.2d 736, 740 (1996) ("[I]n keeping with those public policy considerations which underlie the initial permission rule, we hold that once the named insured ... gives ... consent to another, any third person allowed to drive the vehicle by the initial permittee likewise is covered, except in cases of theft or conversion."); *Odolecki v. Hartford Accident & Indem. Co.*, 55 N.J. 542, 264 A.2d 38, 42 (1970); *United Servs. Auto. Ass'n v. National Farmers Union Property & Cas.*, 119 N.M. 397, 891 P.2d 538, 541 (1995) ("[G]enerally ... coverage extends to any subsequent permittee ... as long as the named insured has given his or her initial permission to use the vehicle."); *cf. Farm Bureau Mut. Ins. Co. v. Hmelevsky*, 97 Idaho 46, 539 P.2d 598, 603 (1975) (third party drives with permission of named insured where "son or daughter allows [third party] to drive the vehicle with express permission although such permission is contrary to the instruction of the parents"). *See generally* 8 Lee

R. Russ & Thomas F. Segalla, *Couch on Insurance* § 112:62 (3d ed. 1997) ("Where the liberal or initial permission rule is followed, even express prohibition is immaterial, as initial permission is deemed to extend to all uses of the vehicle, including delegation.").

10. State Farm cites our decision in *Ewing v. Colorado Farm Mutual Casualty Co.*, 133 Colo. 447, 452, 296 P.2d 1040 (1956), in support of its argument that when a named insured permits an initial borrower to use a vehicle, the named insured does not thereby grant authority to the permittee to allow others to use the vehicle. It is true that, in *Ewing*, we stated that "[g]eneral permission to use a car does not carry authority to let someone else use the car...." 133 Colo. at 452, 296 P.2d at 1043. However, this statement in *Ewing* is dicta because we had already determined that coverage was precluded based upon a notice violation. *See id.* at 451–52, 296 P.2d at 1043. More importantly, *Ewing* was decided before the enactment of the No–Fault Act and our adoption of the initial permission rule, and thus did not take into account the policy considerations set forth in the Act. For these reasons, *Ewing* is no longer controlling on the meaning of "permissive use" and like phrases in no-fault provisions of automobile insurance policies.

906 P.2d at 113–14 (if a driver does not have permission to drive the vehicle, "the driver has no authority to consent to the passenger's use" and the "passenger's right to use the car is necessarily dependent on the driver's right to use the car").

Thus, *McConnell* establishes that persons are not "insureds" when they have been told by the named insured or other authorized user that they do not have permission to use the vehicle.[11] Under these circumstances, it is apparent that the named insured has neither expressly nor impliedly consented to such persons using the vehicle. *McConnell* does not, however, as the court of appeals in the present case suggests, negate the broader proposition that consent to the use of the vehicle by subsequent permittees can flow from the consent of the named insured to the first permittee's use of the vehicle.[12]

■ In concluding that the initial permission rule applies to subsequent permittees, we do not hold that the Act extends coverage to everyone who drives or occupies an insured vehicle. *See McConnell*, 906 P.2d at 113 (in enacting the No–Fault Act, "the General Assembly did not intend for the category of individuals covered under the [Act] to be unlimited."). We reject the position that consent to the first permittee leads to constructive consent to all subsequent drivers. Instead, we regard a permittee as one who has permission from the owner or through a chain of permission. The plain language of section 10–4–712(2), as discussed previously, permits insurers to exclude from coverage persons who are injured because of their own intentional act or who operate a vehicle as converters without a good faith belief in their legal entitlement to operate or use the vehicle. *See* § 10–4–712(2)(b). Thus, persons who use the insured vehicle with knowledge that the named insured has prohibited such use are not insureds, and are properly excluded when a policy extends coverage only to permissive users. In addition, these persons have no authority to consent to another's use of the vehicle. *See McConnell*, 906 P.2d at 114 ("Where a named insured expressly forbids an individual to use his or her car, we fail to see how permitting another to use the car would affect this prohibition."). However, where individuals use the insured vehicle with the permission of the named insured, which may be derived either expressly or impliedly from the permission of a subsequent permittee, they are "insureds" under the Act.

■ We therefore hold that, pursuant to the initial permission rule, once a named insured permits another to drive the insured vehicle on public highways, the No–Fault Act extends coverage to subsequent permittees. Such permittees are "insureds" for purposes of the Act because, by virtue of the chain of consent emanating from the named insured, they have implied permission from the named insured to use the vehicle.

## III.

State Farm contends that, even assuming Angelopulous was an "insured" when he borrowed the keys to the van from Kristin, he became a converter by permitting Raitz to drive the van and by permitting uses of the van that Angelopulous knew were prohibited by Kristin and the Dahlins. The court of appeals also suggested that Angelopulous converted the van at the point when he let Raitz drive, stating that "Angelopulous' status as an 'insured' is questionable given that neither the Dahlins nor Kristin consented to his permitting Raitz to drive the van." *Raitz*, 944 P.2d at 659. In light of our conclusion that the initial permission rule applies to subsequent permittees, we do not agree.

**11.** Of course, if a third party receives express permission from a named insured to use the vehicle, he or she has permission from the named insured regardless of any prohibitions expressed by subsequent permittees.

**12.** Indeed, we expressly pointed out in *McConnell* that we were not deciding the question of what kind of action on the part of the named insured would constitute "consent" for another person's use of the vehicle. *See* 906 P.2d at 113 n. 7 ("As there is no dispute in this case that Brewer did not have permission … we do not consider what kinds of actions or circumstances would confer consent upon a passenger or user of the vehicle under the No–Fault Act.").

As discussed previously, once a named insured grants permission to the initial borrower to use the insured vehicle, subsequent permittees have implied permission to allow others to use the vehicle. This implied permission exists even when the named insured has told the initial borrower not to allow others to use the vehicle. Thus, even assuming, arguendo, that Kristin and the Dahlins did not want anyone else driving the van, and that Angelopulous was aware of this restriction, Angelopulous did not become a "converter" by letting Raitz drive. Rather, once Angelopulous received permission from an "insured" to drive the van, he was also granted authority to permit use of the vehicle by others. Consequently, Angelopulous did not commit an act of conversion when he allowed Raitz to drive the van. *See Maryland Cas. Co. v. Messina*, 874 P.2d 1058, 1065 (Colo.1994) (conversion is " 'any distinct, *unauthorized* act of dominion or ownership exercised by one person over personal property belonging to another'" (quoting *Byron v. York Inv. Co.*, 133 Colo. 418, 424, 296 P.2d 742, 745 (1956))) (emphasis added).

Angelopulous also did not convert the van when both he and Naranjo rode on its roof. In *Wiglesworth*, we held that, when a permittee is given permission to use the vehicle, but uses it in a manner contrary to restrictions imposed by the named insured, the permittee nevertheless acts within the implied permission of the named insured. *See* 917 P.2d at 291. We thus considered the permittee's use of the vehicle in a "drag race" to be permissive because

"if the original taking [of the vehicle] was with the insured's consent, *every act subse-quent thereto* while the [borrower] is driving the car *is held to be within the insured's permission* in order to permit a recovery under the [policy]."

*Wiglesworth*, 917 P.2d at 291 (alterations in original) (emphasis added) (quoting *Universal Underwriters Ins. Co. v. Taylor*, 185 W.Va. 606, 408 S.E.2d 358, 361 (1991)). The initial permission rule thus provides that, once a permittee is authorized to use a vehicle, the authorization extends to all uses of the vehicle, and a conversion under section 10–4–712(2) does not occur merely because the permittee subsequently uses the vehicle in a *manner* that has not been explicitly authorized.[13] *See Wiglesworth*, 917 P.2d at 291.

Here, the trial court found that Angelopulous received valid permission from Kristin to drive the van, and this finding is supported by the record.[14] Because there is nothing in the record indicating that the Dahlins had told Angelopulous that he could not drive the van, Kristin thereby conferred upon Angelopulous both the authority to permit others to drive the van, and the authority to use the van in an unauthorized manner. Thus, Angelopulous did not become a converter by permitting Raitz to drive the van or by riding on its roof.[15] We therefore conclude that Angelopulous' acts subsequent to receiving permission from Kristin to use the van did not negate his status as an "insured" under section 10–4–703(6).

## IV.

We hold that, under the No-Fault Act, once a named insured grants initial permission to use the insured vehicle, the

---

13. This does not mean, of course, that a person may not become a converter by virtue of the fact that his or her permission to use the vehicle has been terminated. *See* 8 Russ & Segalla, *Couch on Insurance* § 113:8.

14. Although the record indicates that Kristin had been drinking prior to handing Angelopulous the keys to the van, there was also evidence, in the form of testimony by Angelopulous, that Kristin was not so intoxicated as to be unable to give valid permission. Because the trial court's finding is supported by the record, we may not overturn it. *See Pickell v. Arizona Components Co.*, 931 P.2d 1184, 1186–87 (Colo.1997) (factual findings of trial court may not be overturned unless unsupported by record).

15. State Farm insists that "[i]f Angelopulous is not a converter ... the vehicle can be used in a way that is so contrary to the use contemplated by the named insured and/or their resident relative as to be ludicrous." We disposed of this argument in *Wiglesworth*, however, where we held that the legislative purposes behind the No-Fault Act support a broad construction of permissive use. Under *Wiglesworth*, even "ludicrous" uses are within the insured's permission as long as they do not constitute theft or conversion.

named insured impliedly consents to use of the vehicle by subsequent permittees unless their "permission" to use the vehicle emanates from a converter as defined in section 10–4–712(2)(b). Thus, where a chain of consent connects the named insured to the operator of the insured vehicle, the operator is an "insured" under the Act. Because Raitz, the driver of the van at the time of the accident, received permission to drive it from Angelopulous, and Angelopulous received valid permission from the initial borrower, Kristin Dahlin, we conclude that Raitz operated the vehicle with the implied consent of the named insureds, the Dahlins. Consequently, coverage for Naranjo's injuries is mandatory under section 10–4–707(1)(c) because Naranjo occupied the van with the consent of an insured. We therefore reverse the judgment of the court of appeals, and remand the case with directions to reinstate the trial court order granting summary judgment in favor of Naranjo.

VOLLACK, C.J., dissents.

Chief Justice VOLLACK dissenting.

The majority holds that the trial court correctly granted summary judgment in favor of Brian Raitz, allowing him to recover personal injury protection (PIP) benefits on behalf of Tristan Naranjo, who was injured after falling off the roof of a van driven by Raitz. The van, which was owned by James E. and Margaret Dahlin (the Dahlins), was insured under a policy issued by State Farm Mutual Automobile Insurance Company (State Farm). The majority concludes that under the initial permission rule announced in *Wiglesworth v. Farmers Insurance Exchange*, 917 P.2d 288, 291 (Colo.1996), Raitz was an "insured" as that term is defined in the section 10–4–703(6) of the Colorado Auto Accident Reparations Act, §§ 10–4–701 to – 726, 3 C.R.S. (1997) (the No Fault Act), because he had the Dahlins' implied consent to drive the van. The majority also concludes that because Naranjo "occupied" the van with the consent of an insured (Raitz), he

is entitled to PIP benefits. I disagree. In my view, Raitz was not an "insured" because he was not authorized to drive the van by the named insured. Consequently, Naranjo was not occupying the van with the consent of an insured and is not entitled to PIP benefits. Accordingly, I dissent.

I.

The Dahlins owned a 1983 Dodge B–150 van which was insured under a State Farm policy describing them as the named insureds. The Dahlins' daughter, Kristin, had the Dahlins' express permission to drive the van but was told on more than one occasion that she was not to permit anyone other than family members to drive the van. This prohibition came after a former boyfriend of Kristin's wrecked another of the Dahlins' cars.

On the afternoon of October 24, 1992, Kristin drove the van and several friends to a park in Boulder where they began drinking beer. After several hours, the group decided to return to Arvada. On the way home, Kristin's boyfriend, Alan Angelopulous, climbed through the van's back doors and onto the roof while the van was moving at forty-five to fifty miles per hour.[1] Kristin, who was driving at the time, stopped the van and "yelled at [Angelopulous] and told him not to do it." However, another passenger, Tim Lemley, subsequently climbed up on the roof. Upon seeing Lemley through the top of the windshield, Kristin stopped the van and told him "don't you ever do that."

That evening, Kristin, Angelopulous, and several other friends went to Lemley's house where they continued drinking beer. Kristin eventually fell asleep on a couch in the basement because she was "too drunk" after drinking "too many" beers. After Kristin "passed out," Angelopulous awakened her to ask for the keys to the van so that he and some others could drive to get some food. Angelopulous claims that Kristin opened her eyes, handed him the keys and went back to

---

1. In his deposition, Angelopulous described the roof of the van as follows:
   It's not straight. It's got these little groove things on it, but basically there's no luggage racks or anything. It's basically pretty much flat, but there's these little groove things in the top of it, and I held on spread-eagle from side to side; James Bond deal.

sleep. Kristin has no recollection of being awoken or of handing the keys to Angelopulous. In her deposition, Kristin testified that she would have refused to give Angelopulous the keys if "he was drunk and had been drinking."

Upon obtaining the keys to the van, Angelopulous, Naranjo, Raitz, and another person proceeded outside where, Angelopulous testified, they began feeling "like crazy idiots." Naranjo drove the van while Angelopulous and Raitz rode on the roof. After stopping at Angelopulous' house for money, Raitz drove while Angelopulous and Naranjo rode on the van's roof. Naranjo subsequently fell off the van's roof and was seriously injured.

Raitz instituted this action as Naranjo's assignee seeking PIP benefits pursuant to the Dahlins' State Farm policy. Both sides moved for summary judgment. The trial court granted Raitz's motion for summary judgment, concluding that Naranjo was entitled to PIP benefits under the Dahlins' policy because he "was an occupant of a vehicle operating on the public highways of Colorado, and had the permission of the named insured." In denying State Farm's motion for reconsideration, the trial court also referred to what it considered a valid "chain of consent" from the Dahlins to Kristin to Angelopulous to Raitz.

The court of appeals reversed, concluding that the trial court erred in determining that Naranjo was entitled to receive PIP benefits under either the insurance policy or the No Fault Act. *See Raitz v. State Farm Mut. Auto. Ins. Co.*, 944 P.2d 657 (Colo.App.1997). The court of appeals remanded the case to the trial court with directions to enter summary judgment in favor of State Farm.

## II.

Section 10–4–707(1)(c), 3 C.R.S. (1997), provides that the coverage described in the No Fault Act shall be applicable to:

Accidental bodily injury arising out of accidents occurring within this state sustained by any other person *while occupying the described motor vehicle with the consent of the insured . . . ."

(Emphasis added.) Section 10–4–703(6), 3 C.R.S. (1997), defines "insured" as "the named insured, relatives of the named insured who reside in the same household as the named insured, or *any person using the described motor vehicle with the permission of the named insured.*" (Emphasis added.)

In *Wiglesworth v. Farmers Insurance Exchange*, 917 P.2d 288, 291 (Colo.1996), we adopted the initial permission rule, which provides that once the owner of a vehicle gives another permission to operate the vehicle, subsequent changes in the character or scope of the use do not require additional, specific consent. *See id.* For example, in *Wiglesworth*, even though the driver had only received permission to drive the named insured's truck to work, we held that the driver was an "insured" for purposes of section 10–4–703(6) despite using the truck for drag racing. Under these circumstances we held that coverage would be precluded only where the deviation from the permitted use rose to the level of theft or conversion. *See id.*

Relying upon *Wiglesworth*, the majority asserts that once the Dahlins gave Kristin permission to use the van, they impliedly consented to any subsequent permission she, or her permittees, might give to others wishing to use the van. In other words, the majority contends that once the Dahlins permitted Kristin's use of the vehicle, they impliedly authorized an indeterminate number of other people to use it as well so long as their use did not involve theft or conversion. As a result, the majority reverses the court of appeals, concluding that

[b]ecause Raitz, the driver of the van at the time of the accident, received permission to drive it from Angelopulous, and Angelopulous received valid permission from the initial borrower, Kristin, ... Raitz operated the vehicle with the implied consent of the named insureds, the Dahlins. Consequently, coverage for Naranjo's injuries is mandatory under section 10–4–707(1)(c) because Naranjo occupied the van with the consent of an insured.

Maj. op. at 1188.

Contrary to the majority, I believe that *Wiglesworth* is not dispositive here because

that case concerned only one level of permission between the named insured and the vehicle's driver. For this reason, our consideration was limited to a deviation from the initially permitted use. *Wiglesworth*, and the initial permission rule we announced therein, does not address situations where permission to use the vehicle is passed from the initial permittee to subsequent drivers. In my view, these subsequent permission cases must be analyzed using the plain meaning of the No Fault Act, which does not include subsequent permittees within the term "insured." *See* § 10–4–703(6).

Furthermore, we explicitly rejected the majority's implied permission rationale in *McConnell v. St. Paul Fire & Marine Insurance Co.*, 906 P.2d 109, 114 (Colo.1995), when we explained that

> section 10–4–707(1)(c) requires an occupier to have consent from one authorized to give such consent in order to qualify for mandatory coverage under the Act. This consent must come from the named insured, a resident relative of the named insured, or the named insured's permittee. A named insured may allow a permissive user a wide scope of discretion, including the authority to permit others to ride in or use the vehicle.
>
> *However, this certainly does not mean that if a named insured permits one person to use the vehicle, he or she thereby permits everyone to use the vehicle.* Where a named insured expressly forbids an individual to use his or her car, we fail to see how permitting another to use the car would affect this prohibition.

*Id.* (emphasis added).[2]

In this case, it is undisputed that the named insureds, the Dahlins, prohibited any-

one other than family members from driving the van. Clearly then, neither Angelopulous nor Raitz had permission from the named insureds to drive the van on the night in question and are therefore not "insureds" under the plain meaning of section 10–4–703(6). For this reason, Naranjo was not authorized to occupy the van by an insured and cannot recover under the Dahlins' State Farm policy.[3] *See McConnell*, 906 P.2d at 114.

Even if, as the majority concludes, the initial permission rule covers situations where there is a chain of consent from the initial permittee to subsequent drivers, the chain in this case was broken once Angelopulous obtained the keys from Kristin. In my view, Angelopulous acted as a converter which forecloses any subsequent claims against the Dahlins' policy. *See Maryland Cas. Co. v. Messina*, 874 P.2d 1058, 1065 (Colo.1994). Although the trial court determined that "there is no evidence to contradict the fact that Kristin willingly gave Angelopulous the keys to allow him to drive the van," the trial court's conclusion is not supported by the record. *See Arapahoe County Bd. of Equalization v. Podoll*, 935 P.2d 14, 18 (Colo.1997) ("Ordinarily, we will defer to the district court's findings of fact unless they are clearly erroneous and not supported by the record.").

Kristin permitted Angelopulous to drive the van on prior occasions; however, she testified that she would never allow him to drive the van if he had been drinking or was drunk. Both Kristin and Angelopulous admitted in their depositions that Angelopulous had been drinking on the day and evening in question. Furthermore, Kristin's "willingness" to hand over the keys is doubtful con-

---

**2.** In *McConnell*, we also explained that
[t]he status of a passenger is necessarily dependent upon the status of the driver. If the driver does not have permission to use the vehicle, the driver has no authority to consent to the passenger's use. The passenger's good faith belief that the driver has such authority does not change the driver's status.
*Id.* at 113.

**3.** Although the parties do not argue that the terms of the State Farm policy differ from the provisions of the No Fault Act, there is one

important difference. The State Farm policy includes within the term "insured" "any ... person who sustains bodily injury while occupying the vehicle with the consent of [the named insured] *or a relative*." (Emphasis added.) Although the definition of "insured" in the State Farm policy includes any person who receives permission to occupy the vehicle from a relative, Naranjo did not receive Kristin's permission to occupy the van. Therefore, Naranjo is not an "insured" pursuant to the terms of the State Farm policy.

sidering that she has no recollection of ever giving them to Angelopulous after being momentarily awoken from a deep, alcohol-induced sleep. Finally, the fact that earlier that day Kristin admonished Angelopulous and another passenger for climbing onto the van's roof further indicates that, if she had been coherent, she would have been hesitant about handing Angelopulous the keys.

### III.

In my view, the trial court erred in granting summary judgment in favor of Raitz. For this reason, I would affirm the court of appeals.